**MOBIL OIL CORPORATION, Plaintiff,**

v.

**DEPARTMENT OF ENERGY and James B. Edwards, Secretary, Defendants.**

No. 81–CV–340.

United States District Court,
N. D. New York.

June 3, 1981.

Bond, Schoeneck & King, Syracuse, N. Y., Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., William C. Streets, Gail F. Schultz, Fairfax, Va., for plaintiff.

George H. Lowe, U. S. Atty., Paula Ryan, Asst. U. S. Atty., Syracuse, N. Y., Thomas H. Kemp, Samuel Sooper, Washington, D. C., for defendants.

## MEMORANDUM–DECISION

MUNSON, Chief Judge.

### I.

Presently before the Court are two motions—the first has been made by the plaintiff Mobil Oil Corporation (Mobil) to enjoin the issuance by the defendants Department of Energy and Secretary James B. Edwards (hereinafter collectively referred to as DOE) of the "January entitlements notice." See 10 C.F.R. § 211.67(i) (1980). The second motion has been made by the defendants to dismiss plaintiff's complaint. Briefly, the entitlements notice is an essential component of the DOE's entitlements program, which is designed to equalize the access of domestic refiners to price-controlled domestic crude oil. See Pasco, Inc. v. Fed. Energy Admin., 525 F.2d 1391, 1395 (Em.App. 1975). This is accomplished by requiring cash transfers (entitlements) to be made from those domestic refiners with a proportionately greater access to price-controlled crude, to those refiners less fortunately situated. A corresponding "entitlements notice" is then published every month reflecting each refiners' entitlements obligation under the program.

To function properly, the entitlements program depends in no small measure on the accurate report of a refiner's "receipts" of price-controlled crude oil. The instant suit grows out of plaintiff Mobil's claim that there are in fact widespread abuses in reporting such "receipts" by refiners. Mo-

bil contends that as a result of this misreporting, it has had to bear a disproportionate share of entitlements obligations. Accordingly, Mobil moved for temporary and preliminary injunctive relief to prevent the DOE from issuing its "January entitlements notice," which allegedly would have immediately required Mobil to shoulder an inequitable share of entitlements obligations. This Court granted Mobil's request for a temporary restraining order on April 21, 1981, and enjoined the DOE "from issuing any further entitlements notices and from requiring Mobil to comply with such notices." The temporary restraining order was to remain in effect for twenty days. *See* Memorandum-Decision and Order; dated April 21, 1981, at p. 6.

In the meantime, the DOE moved to dismiss plaintiff's complaint. The DOE maintains that pursuant to the doctrine of primary jurisdiction, this Court should defer consideration of the instant case, until the DOE has had an opportunity to complete its own investigation of the merits of Mobil's claims. The Court is informed by the DOE that it is currently investigating the problem of misreporting, but has not as yet completed this investigation. For similar reasons the DOE additionally argues that plaintiff has failed to exhaust administrative remedies, and that the instant dispute is not ripe for judicial resolution. Furthermore, the DOE asserts that even assuming arguendo that plaintiff has satisfied these legal doctrines, it has neither stated a claim nor demonstrated that it will suffer irreparable injury, should the DOE issue the "January entitlements notice."

A hearing on plaintiff's preliminary injunction motion was held on May 12, 1981 and live testimony was taken on the issues of misreporting in the DOE's entitlements program, and the likelihood that plaintiff will suffer irreparable harm if the "January entitlements notice" is released. That same day the Court also heard the parties' arguments with regard to the DOE's motion to dismiss plaintiff's complaint. To fully understand the merits of both pending motions, a more detailed examination of the entitlements program is in order.

## II.

Constrained by the Arab oil embargo and dwindling domestic production, the supplies of crude oil in the United States decreased dramatically in 1973. The combined effect of these factors caused severe increases in the price of oil and related products. *See* 39 Fed.Reg. 31650 (August 30, 1974). To soften the economic hardships associated with reduced supplies and higher prices, the Cost of Living Council created a price control system for crude oil as a part of Phase IV, *see former* 6 C.F.R. Part 150, Subpart L, 38 Fed.Reg. 22536 (August 22, 1973), of the Stabilization Program. *See* the Economic Stabilization Act of 1970, *as amended*, 12 U.S.C. § 1904 note. The system was designed to control the prices of petroleum from the wellhead to finished products, and to create a price incentive to encourage the production of additional quantities of domestic crude.

Under the regulations a "base production control level" (BPCL) was established for each domestic crude oil producing property, equal to the volume of production from that property during each month of 1972. Production levels for the property up to the amount of the BPCL in the corresponding months of any subsequent year had to be sold at a price no higher than a regulatory ceiling price. This crude oil was referred to commonly as "old oil." If the property produced crude oil in excess of the BCPL, the additional quantities or "new oil" could be sold at the higher world market price. *See* 10 C.F.R. § 212.72 (1980). Also exempt from price controls, and consequently saleable at world market prices, were all imported oil and crude oil produced from marginal or "stripper" wells. *See* 10 C.F.R. §§ 212.-15–16 (1980). At the same time, refinery prices for selected petroleum products were also controlled by regulations. By their terms, refiners were required to establish base prices for each controlled product at their May 15, 1973 price levels, but were permitted a certain degree of price allowance for the increased costs of imported or

domestic crude oil from which these controlled products were refined. *See* 10 C.F.R. §§ 212.81–85 (1980).

While the end of the Arab oil embargo in 1974 led to replenished supplies of imported crude oil, the overall price of foreign crude increased significantly. This price increase widened the disparity between the controlled price for "old oil" and the market price of "new oil," and was reflected in the costs and therefore the relative prices charged by refiners. *See* 39 Fed.Reg. 31650 (August 30, 1974). However, refiners with greater access to the less expensive price-controlled crude oil—typically the larger integrated refiner—had a cost advantage over those of their competitors who could only secure supplies of uncontrolled crude oil—usually the small or independent refiners. Thus, at a time when increased supplies of crude oil made the market place much more sensitive to price considerations, the economic viability of these small and independent refiners was being threatened. Moreover, consumers in various parts of the country who depended primarily on stocks of uncontrolled crude oil ("new oil," imported and "stripper" crude oil) contended with much higher prices than other regions with ready access to crude oil that was price-controlled.

In an effort to eliminate the inequities in the refining and marketing sectors of the petroleum industry without sacrificing the beneficial elements of the two-tier price system, the Federal Energy Administration (FEA), the immediate predecessor of the DOE, proposed and adopted the entitlements program. *See generally* 10 C.F.R. §§ 211.66–67 (1980); Transcript of May 12, 1981 hearing at p. 31 (hereinafter Tr. at p. ——). As reflected in its legislative history, the primary purpose of the entitlements program was the equitable distribution of price-controlled crude oil throughout the petroleum industry:

> In large measure, the goal of the proposal is to improve the access of small and independent refiners to old domestic oil. In addition, however, the proposed program is also designed effectively to provide all refiners with proportionate amounts of old oil, based on their relative refinery capacities. The proposed program is accordingly aimed not only at bringing the small and independent refining sector as a class into a more competitive position with respect to the majors, but it is also specifically designed to assure that all segments of the petroleum industry will benefit equally from lower-priced domestic oil. Thus, the FEA anticipates that in some cases, major oil companies (with a low level of old oil supplies) will benefit by the program, while some small refiners (with a high level of old oil supplies) may be required to buy entitlements under the program. This goal is consistent with the Congressional objectives of achieving equitable distribution of crude oil at equitable prices among all sectors of the petroleum industry and preserving an economically sound and competitive petroleum industry.

39 Fed.Reg. 31650 (August 30, 1974).

Toward these ends, the FEA rejected the option of actual physical reallocation of crude oil among refiners, in favor of monthly cash payments to refiners with relatively less access to price-controlled crude oil than the national average, from refiners with proportionately greater access. *See* Tr. at p. 32; and 10 C.F.R. § 211.67(b) (1980). These entitlements obligations are costed into the price of crude oil, *see* 10 C.F.R. § 211.67(m) (1980), and then adjusted into the maximum lawful price for the following month. *See* 10 C.F.R. § 212.83(c)(2) (1980). *See generally, Pasco, Inc. v. FEA,* 525 F.2d 1391, 1395 (Em.App.1975); *Cities Service Co. v. FEA,* 529 F.2d 1016, 1021 (Em.App. 1975). A description of the mechanics of the entitlements program follows.

Under the provisions of the entitlements program, each refiner must report on a monthly basis, *inter alia*, its crude oil runs to distillation units, as well as the price, volume, and type of all crude oil booked into the refinery as a "receipt." *See* 10 C.F.R. § 211.66 (1980). These reports are due approximately two months after the report subject month. *Id.* Based on the

information gleaned from these reports, every eligible refiner is issued a number of entitlements for the month. An entitlement is a "license" to refine one barrel of price-controlled crude oil for the month. *See* 10 C.F.R. § 211.62 (1980).

To determine a refiner's monthly allocation of entitlements, the formula—vastly simplified—is as follows: the national domestic supply ratio (DOSR), which is the ratio of price-controlled crude to the national total runs to stills, is multiplied by the volume of crude oil runs to stills reported by the refiner for that month. *See* 10 C.F.R. § 211.67(a)(1) (1980). A refiner is then issued entitlements equal to the above computed figure. The second step in determining the refiner's ultimate entitlements obligation is to calculate the monthly receipts of "deemed old oil." *See* 10 C.F.R. § 211.67(b)(2) (1980). This sum represents a refiner's total receipts of price-controlled crude oil. A refiner's entitlements position is the difference between its entitlement allocation and deemed old oil receipts. If the entitlements allocation is greater than a refiner's deemed old oil receipts, the refiner will be able to sell entitlements. Whereas, if the entitlements allocation is less than a refiner's deemed old oil receipts, it will have to purchase additional entitlements from a refiner that is in a position to sell entitlements, in order to process those additional supplies of price-controlled crude. *See* 10 C.F.R. §§ 211.67(b)–(c) (1980).[1] The regulations do not match up entitlements purchasers and sellers every month for the purpose of making these transactions. Instead, historic trading relationships have evolved in the industry. The price of an entitlement, however, is set by regulation, and is determined by subtracting from the weighted average cost of a barrel of uncontrolled crude, the weighted average cost of a barrel of "old oil." *See* 10 C.F.R. § 211.67(i)(4) (1980).[2]

Every month the DOE publishes an entitlements notice "evidencing the issuance of entitlements" and containing the following information: The DOSR, the name of each refiner to which entitlements have been issued, the number of barrels of deemed old oil included in each refiner's adjusted crude oil receipts, the number of entitlements issued to each refiner, the number of entitlements required to be purchased or sold by each such refiner, and the price at which entitlements shall be purchased and sold. *See* 10 C.F.R. § 211.67(i)(2) (1980). A refiner's failure to comply with the obligations imposed by the entitlements notice or the entitlements program in general, is subject to civil liability of $20,000 per day for each day of non-compliance, and criminal sanctions of imprisonment for one year and a fine of $40,000 per day for each day of non-compliance. *See* 15 U.S.C. § 754; 10 C.F.R. §§ 205.203(a)(2), (b)(1)(A), (c)(1)(B).

Two final points on the operation of the entitlements program must be made. The

1. Imagine a system with only two refineries, each of whom runs 100 barrels of crude. Refinery A has only price-controlled crude at a value of $8.00 a barrel and Refinery B has only uncontrolled crude at $38.00 a barrel. Now, in this particular example the supply ratio that I am speaking of would be 100 barrels of price-controlled crude divided by 200 barrels of runs or fifty percent.

 The entitlement price would be the difference between the $38.00 uncontrolled price and the $8.00 old oil price or $30.00 for each entitlement. When the entitlements list were issued it would be seen that Refiner A would require 100 entitlements, he would only have been issued fifty. Therefore, he would have to buy fifty entitlements from Refiner B at a cost of $30.00 for each entitlement and when

these transactions are finished you would find through arithmetic that Refiner A's average crude cost ... would have gone up $15.00 a barrel to a total of $23.00 a barrel whereas Refiner B's average crude cost would have gone down $15.00 per barrel from $38.00 and would also be at $38.00 and you can see that we have in effect allocated the benefits of price-controlled equitably.

 Testimony of Roy K. Murdock, General Manager of Crude Oil and Gas Liquids for Mobil Oil Corporation's United States Marketing and Refining Division. Tr. at pp. 33–34.

2. In other words, "The price of entitlement was, in effect, the economic benefit of access to price-controlled oil." Murdock testimony, Tr. at p. 33.

first is that although the entitlements program is operated on a monthly basis, a given month's entitlements notice does not reflect a "freeze-frame" picture of the refinery industry for that month. As a primary matter, the entitlements notice itself is issued two months after the subject month it reports about. Secondly, such factors as errors in reporting, recertifications of crude oil, adjustments in crude oil receipts and costs, and exception relief granted by the DOE's Office of Hearings and Appeals, inject a degree of inaccuracy in each month's entitlements notice. Yet, over the course of the program these discrepancies are supposed to be accounted for, and correction lists are issued accordingly. See Tr. at p. 46, and Plaintiff's Exhibit # 2(y).

It should also be noted that the entitlements program has been amended several times over the course of its life.[3] Some of these amendments were to further advance the goal of equitable distribution of price-controlled crude oil. Still other changes have been for the purpose of granting subsidies to various sectors of the petroleum industry. For example, the deemed old oil computation was necessitated by a change in the program that added an "upper" tier of price-controlled crude oil, and redesignated "old oil" as "lower" tier.[4] It will be recalled that the original form of the entitlements program only included the one category of "old oil." Perhaps most affected by the changes in the entitlements program's directions, especially in the area of subsidies, has been the DOSR calculation. The DOSR now incorporates different types of subsidies, which are provided in the form of additional allocations of entitlements for the following programs: small refiner "bias," exceptions and appeals relief in the

entitlements program, California heavy crude refining incentives, for the import of naptha into Puerto Rico, for the import of residual fuel oil into the East Coast refining district, synthetic fuel development, domestic residual fuel deductions, and for crude oil sold to the Strategic Petroleum Reserve. The effect of these program modifications has been to reduce the size of the DOSR. As shall be explained in greater detail momentarily, a lower DOSR causes fewer entitlements to be issued to all refiners, and therefore increases their proportionate burden under the program. In addition, a lower DOSR furthers the likelihood that even some traditional entitlements sellers will become entitlements purchasers.[5] See infra at pp. 429–430. With this examination of the purpose, evolution, and operation of the entitlements program complete, the Court turns to consider the factual predicate for Mobil's assertion that a preliminary injunction should issue against the DOE's "January entitlements notice."

### III.

Due to the cost differential between a barrel of price-controlled and uncontrolled crude oil, there was always a financial incentive in the petroleum industry to find methods, whether legal or extra-legal, to "convert" price-controlled crude oil into uncontrolled crude oil. A refiner that could make a barrel of price-controlled oil—selling, for example, at $8.00 a barrel, "disappear" and then later "reappear" as uncontrolled crude oil—selling, for example, at the world market price of $38.00 a barrel, would stand to make a tidy profit of $30.00 on each barrel sold. Mobil asserts that the phased, and more recently, the complete decontrol of the petroleum industry has provided even additional financial incentive

---

**3.** See generally "Validation of the Crude Oil Entitlements Information System," study prepared for the DOE by Tera, Inc., dated March 9, 1981 [hereinafter Validation Study]; Appendix C "History of the Entitlements Program;" Attachment F–1 "The Domestic Crude Oil Entitlements Program Calculations." Upon Mobil's motion and over the DOE's claim of executive privilege, the Court ordered the DOE to release this study for purposes of the instant litigation.

See this Court's May 15, 1981 Memorandum-Decision and Order.

**4.** Today, the deemed old oil calculation also factors in the weighted average cost of upper tier Alaska North Slope crude oil. See 10 C.F.R. § 211.67(b)(2) (1980).

**5.** Validation Study, Attachment F–1 at p. F–42.

to cheat or "game" the price-control regulations. Some additional background on decontrol is necessary.

On April 5, 1979 President Carter announced his intention to deregulate all domestic crude oil. Soon thereafter, the DOE took steps to implement the President's decision, and it adopted the first of a series of amendments to its regulations, with a view towards gradually lifting the price-controls on domestic crude-oil by October 1, 1981. *See* 44 Fed.Reg. 66187 (November 19, 1979). The plans for phased decontrol, however, were interrupted by a change in presidential administrations. Shortly after being sworn into office, President Reagan fulfilled one of his campaign pledges by issuing Executive Order No. 12287 on January 28, 1981. That Order provides in pertinent part:

> By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended (15 U.S.C. 751 *et seq.*), and notwithstanding the delegations to the Secretary of Energy in Executive Order No. 11790, as amended by Executive Order No. 12038, and in order to provide for an immediate and orderly decontrol of crude oil and refined petroleum products, it is hereby ordered as follows:
>
> Section 1. All crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended. The Secretary of Energy shall promptly take such action as is necessary to revoke the price and allocation regulations made unnecessary by this Order.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Section 3. The Secretary of Energy may, pursuant to Executive Order No. 11790, as amended by Executive Order No. 12038, adopt such regulations and

take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order.

> Section 4. The Secretary of Energy is authorized to take such other actions as he deems necessary to ensure that the purposes of this Order are effectuated.
>
> Sec. 5. Because advance notice of and public procedure on the decontrol provided by this Order would be likely to cause actions that could lead to economic distortions and dislocations, and would therefore be contrary to the public interest, this Order shall be effective immediately.

46 Fed.Reg. 9909–10 (January 30, 1981).

The announcement of phased decontrol and the knowledge that all price-controls on crude oil would be lifted by October 1, 1981, imparted refiners with a new and unique opportunity to cheat or "game" the regulatory system and to make "windfall" profits. With the coming of decontrol, all a refiner had to do in order to maximize its profits on price-controlled crude oil, would be to somehow withhold barrels of the low cost price-controlled crude from the market until after the date of decontrol.[6] Of course, a barrel of price-controlled crude oil after the date of decontrol would be worth the higher world market price. Thus, when decontrol was announced on April 5, 1979, the petroleum industry was at once provided with further incentive to cheat and "game" the regulatory scheme, and with the method to accomplish these ends. In addition, unwitting participation in such schemes was forthcoming from the political arena. Due to his campaign pledge, President Reagan's election in November 1980, brought with it the chance that complete decontrol would be adopted before its scheduled date of October 1, 1981, and that profits could be taken even sooner. This turned out to be a

---

**6.** This conclusion is confirmed by the Validation Study at p. IX. A Congressional Committee reported that a similar problem of disappearing stripper well oil could also be traced to the anticipation of decontrol. *See* H.R.Rep. (96–150–58) 96th Cong., 2nd Sess., Committee on Interstate Commerce, The Case of the Billion Dollar Stripper, (October, 1980).

safe bet, since, as stated already, decontrol of the petroleum industry was in fact ordered by President Reagan on January 28, 1981. Testimony provided by Mobil suggests that this was also the day when millions of barrels of once price-controlled crude oil suddenly began to "reappear." A more detailed examination of this phenomenon and its effect on the entitlements program follows.

At a May 12, 1981 hearing held by this Court on plaintiff's motion for a preliminary injunction, testimony was taken on the problem of the disappearance of price-controlled oil, and its specific effect on the entitlements program. Testifying for plaintiff Mobil was Mr. Roy K. Murdock, General Manager of Crude Oil and Gas Liquid for Mobil's United States Marketing and Refining Division. Murdock based his conclusions about the disappearance of price-controlled crude oil, and its subsequent reappearance, on an analysis of data contained in the "Domestic Crude Oil First Purchasers Report" and the monthly entitlements notices. Appropriately entitled, the First Purchaser reports, inter alia, collects data at the first point of purchase of crude oil, which is usually at the refineries. It will be recalled that the monthly entitlements notices publish data on each of the calculations relevant to the operations of the entitlements program, such as all refinery receipts. See supra at pp. 425–426. Therefore, a comparison of the two data systems can be expected to yield statistically similar volumes of crude oil moving throughout the industry.[7] Nonetheless, it shall be seen that in actuality, wide discrepancies between the two systems are commonplace, thus evidencing the disappearance phenomenon.

Murdock testified at the hearing that the DOSR—the ratio of price-controlled crude to total runs to stills—has gradually declined between 1979 and 1980, with a marked decline evident in November and December of 1980. Tr. at pp. 48–49; Plaintiff's

Exhibits # # 3 and 4 [plaintiff's exhibits will be delineated Exh. # _.] In the same two-year period the price of an entitlement—the difference between the cost of lower tiered price-controlled and uncontrolled crude oil—more than tripled from $8.74 to $27.06. Id. As for the comparison of the First Purchasers data and entitlements program receipts, Murdock testified that in the past two years a disparity or disappearance occurred in volumes of lower tier price-controlled crude reported, and that this disparity has increased over time. Exh. # # 5 and 6. In January, 1979, some 179,000 barrels of price-controlled crude oil were disappearing every day. By December, 1980, the rate of disappearance had increased to 520,000 barrels of price-controlled crude oil every day. Tr. at pp. 52–53.

A comparison on the First Purchasers and entitlements program data on upper tier crude oil shows equally dramatic trends. Tr. at pp. 56–59; Exh. # # 7 and 8. For approximately the first six months of 1979, more upper tier crude was reported as received at refineries than was produced and sold during that period. This trend inverted by August 1979, and a disparity or disappearance of 93,000 barrels per day of price-controlled crude oil was reported. By December of 1980 the disappearance rate had increased to 426,000 barrels per day. It should be added that the relative price of upper tier crude oil during this period changed substantially. At the beginning of 1979 upper tier crude was very near in price to the world market price of crude oil. However, by the end of 1979 the world market price of crude oil had out-paced the price of upper tier crude, and was worth approximately twice as much. The data for upper tier Alaskan North Slope Crude, which has been price-controlled since May 1980, shows a pattern similar to that of upper tier crude. Tr. at pp. 60–62; Exh. # # 9 and 10. At the same time, overall production in all tiers of price-controlled crudes was declining throughout 1979 and

7. The soundness of this conclusion is confirmed by the Validation Study, Appendix J at pp.

1980. Tr. at p. 64. Nevertheless, a calculation of the percentage disparity, for example, in both categories of lower and upper tier crude is quite revealing. In January 1979, 2.3% of lower and upper tier crude oil had disappeared; by December 1979, 43.4% of lower and upper tier crude oil had disappeared. Tr. at pp. 64–66; Exh. # # 12 and 13.

In total figures, in the year 1979, between 5.2 million and 10.4 million barrels of crude oil were disappearing from the regulatory system *every month*. By the year 1980, between 12.0 million and 29.6 million barrels of crude oil were disappearing *every month*. Tr. at pp. 69–71; Exh. # # 14 and 15.[8] While these millions of barrels of price-controlled crude oil were disappearing, curiously, it seems that at least some of this crude oil was reappearing as decontrolled crude. In January 1980 a surplus of 175,000 barrels per day of decontrolled crude oil appeared in the regulatory system. This figure represents crude oil that was reported as receipts by refiners, but was not reported as having been purchased by first

purchasers. By December of 1980, there were 809,000 barrels per day of decontrolled crude oil reappearing in this manner, even though there was really no record of it having been produced. Tr. at pp. 81–83. Significantly, the accuracy of all the data described above is not contested by· the DOE.

If the cost of an entitlement is factored into these figures for disappearing crude, remembering that between 1979 and 1980 the price of an entitlement was increasing, $5.6 *billion* of entitlements obligations were not channeled through the entitlements program on a total volume of over 250.3 million barrels of price-controlled crude oil. Tr. at pp. 71–75; Exh. # # 15 and 16. Moreover, from the American public's point of view, if price-controlled crude that disappeared later reappeared as higher priced uncontrolled crude, then this $5.6 billion figure represents increased crude costs that may be passed on to them. The Court will next address in more specific terms the ways in which the disappearance of price-

---

**8.** The Validation Study also reported on the disappearance of price-controlled crude oil:

Comparisons of adjusted DCOE data to data reported on the Domestic Crude Fuel Purchaser (sic) system (DCFP) for the period 1977 through 1979 show DCFP data to be greater on an annual basis for all receipt categories combined with net annual differences decreasing from 158.2 million barrels in 1977 to 102.9 [hand corrected in Report to 33.9] million barrels in 1978 [hand corrected in Report to 1979]. In 1979, aggregate domestic receipts reported to DCOE exceeded those reported on DCFP by 1.2 million barrels. Since some of the total net differences in 1979 may be accounted for by condensate and utility and other non-refining usage, on a gross yearly basis, the vast bulk of domestic crude sold to first purchasers appears to find its way to refiners.

Important differences have been found, however, in comparing categorical volumes reported on the two systems. Particularly in 1979, both old oil and new oil have "disappeared" between DCFP and DCOE systems. In the case of old oil, the 1979 difference resulted in a net "disappearance" of 78.4 million barrels (215,000 barrels/day) or 9.78 percent of all reported DCOE receipts. If this discrepancy was in fact due to errors in the DCOE system, then old oil for 1979 could be said to have been understated by 8.91

percent. For the 3 year period, old oil may have been up to 9.87 percent understated. [See Appendix K, # 28].

New oil receipts also differed between the two systems (DCOE and DCFP) in 1979, such that 9.4 million barrels (26,000 barrels/day) or 0.87 percent may have "disappeared." New oil receipts then may have been 0.86 percent understated in 1979.

*Id.* at pp. 456–457. *See also* Validation Study at pp. i, vii, 95, 96, J–28—J–32. The Validation Study further confirmed that upon "disappearing," the price-controlled crude "reappeared" as uncontrolled crude. Summarizing the twin problems of the disappearance and reappearance of crude oil, the Validation Study concluded:

The impacts or consequences of these discrepancies are, however, significant. In terms of data quality, the net volume of "missing" old oil represents 9.78 percent of the volume of old oil reported on DCOE·in 1979. (7.5 percent of the reported volumes for all three years). The net volume of "missing" new oil represents 0.9 percent of the volume of new oil reported on DCOE in 1979 (for the three-year period, new oil receipts reported on DCOE exceeded those on DCFP by 0.6 percent of the reported new oil receipts on DCOE).

*Id.* at p. 96.

controlled crude impacts upon entitlements program refiners. Afterwards, the possible explanations for the disappearance will be considered.

To understand how the disappearance of price-controlled crude oil affects the entitlements program refiners, the mechanics of the program must be reconsidered. The disappearance of price-controlled crude oil causes a concomitant reduction in the DOSR—the ratio of price-controlled crude to the national total runs to stills. Since the number of entitlements issued to each refiner is a product of the DOSR and that refiners' runs to stills, a shrinking DOSR will cause less entitlements to be issued to all refiners in the program. This means that an entitlements purchaser will have to purchase more entitlements to make up for this net loss, and to be able to refine its excess of price-controlled crude over the national average. By the same token, a seller of entitlements is negatively affected by being issued less entitlements, because it will have fewer entitlements to sell in order to offset its limited access (in comparison to the national average) to price-controlled crude. Moreover, the disappearance of price-controlled crude oil increases the likelihood that the DOSR will shrink to such a low level that it would cause many traditional entitlements sellers to have access to more price-controlled crude oil than the national average.[9] With this change in position these traditional entitlements sellers would themselves be required to become purchasers of entitlements.

As a participant in the entitlements program Mobil has been directly affected by the problem of disappearing crude oil. Mobil traditionally has been a purchaser of entitlements and has expended some $800 million over the life of the program. Tr. at p. 38. In December of 1980, for instance, Mobil was required to purchase $48 million worth of entitlements. Because it has been a traditional purchaser of entitlements, Mobil has had to purchase additional entitlements as a result of the disappearance of price-controlled crude oil, and the fewer entitlements it has been issued due to the shrinking DOSR. *See* Exh. # 3. Murdock testified that in 1979, with Mobil's approximately 5% industry share of the national runs to stills, Mobil paid an additional entitlements burden of $64.4 million on $1.3 billion of entitlements obligations that escaped the program as a result of the disappearance of price-controlled crude oil. In the year 1980, however, Mobil's increased entitlements burden was four times this amount. According to Murdock's testimony, $4.3 billion of entitlements obligations escaped the entitlements program in 1980, and Mobil's share of that burden was $220 million of additional entitlements purchases—all because of disappearing price-controlled crude. This figure represents 85% of Mobil's total entitlement's obligation for that year. Tr. at p. 91; Exh. # 21.

Murdock testified that a variety of factors could have contributed or actually have

---

**9.** Similarly, the Validation Study found that the disappearance of price-controlled crude oil had a major impact on participants in the entitlements program and on consumers. The Study observed that the problem of disappearing oil:

> Apart from considerations of data quality, from the standpoint of the entitlements program, "losses" of controlled crudes (old and new oils) cause the DOSR to be lower (i. e., understated). Thus, fewer entitlements are allocated and fewer entitlements obligations are paid. For example, using adjusted/amended total old and new oil receipt volumes for 1979, if the entire discrepancy between the DCOE and DCFP systems was in fact due to errors in DCOE data, then the amount of entitlements obligations not incurred can be estimated at $1.341 billion. For the reference month of December, 1979,

> if all of the apparent discrepancy between the two systems (DCOE and DCFP) was caused by "errors" in the DCOE data, the DOSR would have been reduced from 0.234137 to 0.214510 (8.38 percent of what the DOSR "would have been" if the "missing" old and new oil was included). This would result in decreased entitlement allocations totaling $208.5 million (8.38 percent), increasing all refiners' per-barrel post-entitlement crude cost by $0.43 (1.85 percent). (See Appendix K, # 40.)
>
> From the consumer's standpoint, if the crudes that disappeared in 1979 reappeared as higher-priced uncontrolled (such as stripper), then up to $1.344 billion in "extra" crude costs may have been passed through.

Validation Study at pp. 104–05. (Footnotes omitted).

caused the incredible disappearance of price-controlled crude. Certainly phased decontrol is one of these, since it was designed to gradually reduce the amount of crude oil subject to price-controls. A second factor is that the entitlements system is constantly undergoing adjustments and corrections. Yet the importance of either of these reasons is suspect due to the fact that the disappearance of price-controlled crude was both continuous, and increased at a faster rate than the base volumes of price-controlled crude were decreasing.[10] Tr. at p. 55; see e. g. Exh. # # 5–8, 12.

Still a third possible explanation for the disappearance of price-controlled crude is the operation of the DOE's Tertiary Incentive Program. As part of the phased decontrol of crude oil, and for the purpose of increasing domestic production, the DOE adopted the Tertiary Program to provide producers with front-end financing for exotic or "enhanced" forms of oil recovery. See 46 Fed. Reg. 25315 (May 6, 1981). This incentive was in the form of enabling a producer to recertify lower and upper tier crude oil as tertiary incentive crude, and, as a consequence, to receive the market price instead of the otherwise applicable controlled price. More specifically, under this program a producer may certify sufficient quantities of crude oil as tertiary incentive crude to enable it to receive additional revenue to recover expenses on seventy-five percent of certain enhanced forms of crude oil recovery. Murdock raised the possibility that, in the process of recertifying the price-controlled crude oil as tertiary incentive crude, the First Purchasers or entitlements program data might not have accurately accounted for and reported this recertification. Thus, a reporting error could have resulted such that a barrel of price-controlled crude would seem to have disappeared upon a comparison of the First Purchasers and entitlements program data.

After raising this possibility, Murdock effectively demonstrated that it was an implausible explanation for the disappearance of price-controlled crude. Murdock conceded that the Tertiary Program would cause the DOSR to shrink because tertiary incentive crude reduced the quantity of price-controlled crude on the market. As described before, a shrinking DOSR causes additional burdens to befall entitlements program refiners. See supra at pp. 429–430. But he discounted the likelihood that the failure of first purchasers to adjust for tertiary incentive crude could account for the significant disappearance of price-controlled crude oil. Some further background on the adjustment procedures in the First Purchasers Report and the entitlements program will prove useful.

There is a difference in adjustment procedures between the First Purchasers and entitlements program data collection systems. In the First Purchasers system, a barrel of crude oil reported as price-controlled in the month of September, for example, and subsequently recertified the following month as price-controlled crude, would not cause the September First Purchasers data to be adjusted. Instead, the recertification would be shown in the next month's First Purchasers report. The contrary is the case with the entitlements program, which would adjust its September data to reflect the recertification of the price-controlled crude. However, based on the foregoing, a subsequent comparison of the First Purchasers and entitlements program data for the month of September would show that one barrel of price-controlled crude had disappeared. Furthermore, it is possible that a disappearance could also be caused if the first purchaser were to simply fail to make the amendment in the First Purchasers Report to reflect the tertiary incentive recertification to begin

---

**10.** The Validation Study supports the view that factors such as the definitional differences between the First Purchasers and entitlements programs, adjustments and errors in reporting, only would account for an insignificant net disappearance of price-controlled crude. Id. at pp. 96–100. Furthermore, the Study eliminated the possibility that non-refinery uses of crude oil had a material effect on the statistics for disappearing price-controlled crude oil. Id. at p. 98.

with. In both of these examples the disappearance would have been caused by the fact that the barrel of price-controlled crude was not entered into the September First Purchasers Report as price-controlled crude, but was adjusted in the September entitlements program data as tertiary incentive crude.

Murdock testified that for several reasons these two scenarios are improbable explanations for the disappearance of significant quantities of price-controlled crude oil. First, he stated that there was absolutely no incentive for a first purchaser of crude oil to "neglect" to properly amend its First Purchaser filing to account for the recertification of tertiary incentive crude. Tr. at p. 110. A refiner's First Purchaser filing is nothing more than a report, and does not, unlike the refiner reports of the entitlements program, affect that refiner's financial obligations under the DOE's regulatory scheme. *Id.* at 110–11. In fact the opposite appears to be the case. The First Purchasers Report for the year 1980, and for January of 1981, *see* Exh. # 1, reveals that in fact first purchasers accounted for hundreds of thousands of barrels of tertiary incentive crude. Moreover, at the hearing on plaintiff's preliminary injunction motion, there was no evidence presented that would suggest that the accuracy of the First Purchasers Reports should be substantially doubted.[11] And while it would be possible that, in recertifying tertiary incentive crude, differences in deadline amendment requirements could cause a barrel of price-controlled crude to seem to have disappeared, adjustment procedures would eventually account for the disappearance in the following month's data, and no net loss actually would have occurred.

Of greater moment is the fact that, even assuming arguendo that the disappearance of price-controlled crude oil could be explained by misreporting in the Tertiary In-

centive Program, this rationale would not account for most of the crude oil that has disappeared. The volume of crude oil attributable to the entire Tertiary Incentive Program is relatively insignificant when compared to statistics on the total volume of disappearing price-controlled crude. Tr. at p. 126. Furthermore, the problem of misreporting in the Tertiary Incentive Program, under the scenario outlined above, would only address the disappearance of price-controlled crude oil that has *already* been booked as such into the entitlements program as a refinery receipt. By contrast, the disappearance of crude oil as reflected in a comparison of the First Purchasers and entitlements data, is caused by the problem of crude oil that has not been booked into the entitlements program in the first place. Therefore, the purported problem of misreporting in the Tertiary Incentive Program could not explain how millions of barrels of price-controlled crude oil, accounted for in the First Purchasers Reports, subsequently disappeared and were never booked into the entitlements program.[12]

Murdock testified that the most reasonable explanation for the disappearance of price-controlled crude, and why much of it never seems to reach the entitlements program, is due to the use of manipulative inventory practices by refiners in the entitlements program. Tr. at pp. 53–4. For a refiner looking to maximize profits through the sale of price-controlled crude after decontrol, entitlements obligations would first have to be avoided. Manipulative inventorying uniquely serves this end. After the announcement of decontrol, refiners realized that commonly used inventory practices in the industry could also be employed to delay the booking of their relatively inexpensive price-controlled crude as received at the refinery (this is called "selective inventorying," tr. at p. 78), until after the

---

11. *See supra*, note 10.

12. The Validation Study concluded: "Thus while the inclusion (or exclusion) of out-of-period adjustments can be seen to affect any comparisons of *monthly totals*, over longer periods of time (e. g., 1 year), these monthly variations can be expected to cancel each other out, and the inclusion (or exclusion) of adjustments or amendments can be seen to contribute to very little, if any, to the apparent discrepancies between systems." *Id.* at p. 98.

date of decontrol, when it would be worth the much higher world market price. The obvious point of this exercise was to avoid the entitlements obligations in order to make a "windfall" profit from the difference between the controlled and market price—approximately $25.00 per barrel—on each barrel of price-controlled crude inventoried in this manner. Tr. at p. 38. In other words, the purpose of the plan was to make price-controlled crude oil disappear, and then later reappear for sale after decontrol.

If refiners scanned the horizon to search out obstacles to this plan in general, or to manipulative inventory practices in particular, they were not to find them in the DOE's entitlement program regulations. Actually, even before the announcement of decontrol, a variety of manipulative inventorying practices were already permitted by the entitlements program's regulations and reporting procedures. The origins of such practices may be traced to the program's accounting constructs, which provide that an entitlement obligation is to only be imposed at the time a barrel of price-controlled crude oil is reported as having been received by the refinery. More specifically, a refinery receipt is charitably defined as follows:

"Crude receipts" means, as to a particular refiner, the volume of crude oil (a) booked into its refineries in accordance with accounting procedures generally accepted and consistently and historically applied by the refiner concerned, for its own account or for the account of a firm other than a refiner or (b) if not previously so booked into its refineries, delivered by that refiner for its account to another refiner pursuant to a processing agreement with that other refiner. Crude oil receipts shall not include crude oil received by a refiner for the purpose of processing at its refineries for the account of another refiner. A particular crude oil receipt shall be deemed to have occurred when the related cost is booked into refinery inventory in accordance with accounting procedures generally accepted and consistently and historically applied by the refiner concerned, whether or not such crude oil has been actually received by that refiner, except that crude oil delivered by one refiner to another refiner pursuant to a processing agreement will be deemed to have been delivered by the delivering refiner to the other refiner when the risk of loss passes to the other refiner under the particular processing agreement or when the crude oil is received at the refinery of the other refiner, whichever occurs first. Crude oil which has been added by a refiner to its inventory and which is thereafter sold or otherwise disposed of without processing for the account of that refiner shall be deducted from its crude oil receipts at the time when the related cost is deducted from refinery inventory in accordance with accounting procedures generally accepted and consistently and historically applied by the refiner concerned. The volume of domestic crude oil included in a refiner's crude oil receipts shall be evidenced by and consistent with invoices received with respect to such crude oil receipts.

10 C.F.R. § 211.67 (1980); See tr. at pp. 84–5.

Thus, constrained simply by the flexible requirement that they employ "accounting procedures generally accepted and consistently and historically applied," a refiner is in effect allowed by the regulations to report a receipt of price-controlled crude for entitlements purposes at any point in the supply chain from wellhead to refinery gate.[13] Tr. at p. 102. A variety of account-

---

**13.** Murdock's testimony on the flexibility of entitlements program regulations was confirmed by the Validation Study:

The program-dependent nature of the key data elements thus tends to cloud what appear to be otherwise straight-forward definitions. Particularly in the case of receipts, substantial interpretational latitude for respondents is built into the system by the regulations. Total receipts for the industry include volumes of crude at every stage of the supply chain from wellhead to refinery gate. While most receipts are directly tied to some physical transaction that has already

ing techniques have been used as a result, as have inventory practices designed to take advantage of them. For instance, some refiners use the "refinery gate" method which reports the crude as a receipt at the time it physically enters the refinery.[14] This legally enables a refiner to leave unreported for entitlements purposes, any price-controlled crude that has been purchased by the refiner, but continues to be physically located outside the refinery; such as in pipelines, intermediate storage, and in terminals or ships.[15] Tr. at pp. 53–4. This practice is to be distinguished from the method whereby a barrel of crude is deemed as a receipt when some physical transaction has already occurred. For instance, Mobil uses a point of purchase (usually at the wellhead) inventory practice. By comparison to the previous example, Mobil would be required to report for entitlements purposes, crude it had purchased though had not as yet physically received. Tr. at p. 86.

Another legal and quite commonly used practice is called "time exchanges." *See* 10 C.F.R. § 211.67(g) (1980). Under this practice a refiner, for example, exchanges crude with another refiner in one month, with the intent that crude oil of similar quality and quantity would be returned in the following month. However, under the entitlements program's regulations, the receipt of the crude oil need not be reported until it is actually received on exchange.[16] Tr. at p. 78. It will be recalled that an entitlement obligation is only incurred when a barrel of price-controlled crude is booked into a refin-

er as a receipt. With the use of time exchanges, a refiner could exchange away price-controlled crude for decontrolled crude to be returned on the event of decontrol. The regulations, moreover, would seem sufficiently broad to permit refiners to engage in reciprocal time exchanges so that both could assist the other in avoiding the entitlements obligations. Tr. at p. 79. At the same time, Section 211.67(g) apparently would permit a refiner to avoid reporting receipts of price-controlled crude oil exchanges, where the terms of the exchange were not limited to location and quality differentials, and instead focused on the crude oil "tier" being exchanged. A refiner engaged in this type of practice with a reseller or other refiner that had been able to avoid reporting a crude oil receipt under the entitlements program, would not have to report a price-controlled exchange after decontrol.

The final manipulative inventory device that will be discussed is called "splitting entitlements." Tr. at p. 85. Murdock testified that the entitlements program regulations are flexible enough to permit refiners to selectively deem their non-refining inventories to be made up entirely of price-controlled crude oil. Refiners could take advantage of this regulation to avoid entitlements obligations. He described this practice as follows:

> In point of fact, a refiner is permitted, if his accounting system, historic accounting system allowed, to selectively deem that price-controlled oil as being short-stopped or withheld in intermediate inventory as

---

occurred (e. g., receipt at the refinery gate, transfer of title at the point of first sale, or loading into a tanker), in some cases receipt volumes are tied to physical transactions that will (or are expected to) occur in the future (i. e., in the case of some exchanges). In addition, many individual respondents report crudes from different sources in different ways, thus qualifying the meaning of receipts for that respondent alone. In short, the data elements are *financial/accounting* and *program constructs* that have little meaning outside their programmatic contexts. *Id.* at p. 42. *See also* Validation Study at pp. 8, 40, 93; Appendix I at p. I–6; Appendix J at p. J–28.

**14.** The Validation Study reported that "about 30 percent of the refineries sampled booked domestic receipts upon receipt at the refinery gate." *Id.* at p. 68.

**15.** In this regard the Validation Study states that "Respondent interviews confirmed that many large integrated companies do not necessarily book crude immediately into 'refinery accounts.' Instead, crude may be carried on the books of a production or supply company, and reported as being physically located not at refineries." *Id.* at Appendix J, at p. J–36.

**16.** *See supra,* note 13.

illustrated on this chart and that uncontrolled oil is being withdrawn from that inventory outside the refinery and delivered to the refinery.

\* \* \* \* \* \*

Price-controlled oil would appear to, would seem to disappear between the first purchaser and the refinery while uncontrolled oil would reappear. The obvious intention of this action would be to retain that price-controlled oil in that tank outside the refinery prior to its position, prior to its imposition of entitlement obligation until decontrol.

Tr. at pp. 85–6; *see* Exh. # 21.[17]

Still, to fully understand the likely impact of these inventory practices on the problem of disappearing crude oil, it must be appreciated that even before the announcement of decontrol, refiners manipulated their stocks of crude oil to reduce inventory costs and to maximize their profits.[18] This too was accomplished by intentionally inventorying the less expensive price-controlled crude, and by constantly refining the more expensive uncontrolled crude. Moreover, even then the price-controlled crude was "short-stopped" outside the refinery to avoid the entitlements obligations.[19] It therefore seems highly probable that since the announcement of decontrol, each of the above described inventory practices have continued to be used by refiners, but with the promise of much more profitable results, than before. Plainly, these practices would perfectly serve both to enable a refiner to avoid entitlements obligations, and to resell price-controlled crude after decontrol in order to take advantage of the world market price. And consider the incentive to misreport: the fewer barrels of price-controlled crude an entitlements seller reports, correspondingly fewer entitlements will be charged off of its total obligations. Similarly, the fewer barrels of price-controlled crude reported by an entitlements purchaser, correspondingly fewer entitlements will have to be purchased.

Furthermore, the manipulative inventory practices just described could not only accomplish these ends, they were virtually sanctioned by the DOE's flexible regulations. Thus, it is reasonable to assume that manipulative inventorying would explain much of the disappearance of price-controlled crude, especially when it is considered that other devices that could be employed to achieve the same results were illegal.[20] For instance, the miscertification of price-controlled crude oil as decontrolled

---

**17.** This practice was uncovered by the Validation Study:

If it is assumed that holders of crude stocks will seek to minimize their inventory costs, then it will be advantageous for them to attempt, wherever possible, to have those inventories consist of lower-priced crude (i. e., old oil). This hypothesis was shown to be true in the case of one major integrated oil company that held crude stocks outside its refinery accounts and thus outside the entitlements program. These stocks intentionally consisted of predominately old oil. In that company's case, the separate crude supply division acted essentially as a reseller of crude, "selling" only such crude to the refining entity as it chose to (in this case, higher-priced, generally uncontrolled crudes) in order to keep its inventory value as low as possible.

Id. at p. 103; Executive Summary at p. IX.

**18.** The Validation Study confirms these practices were employed between the years 1977 and 1979:

Exhibit J–23 also shows that while "entitlement stocks" have been drawn down over the three-year period (28.8 million barrels), stocks held at locations other than refineries have been significantly built up (124.3 million barrels). This finding is relevant to the problem of the "disappearance of old oil" in that one explanation given the problem was that stocks may have been built up, possibly with significant volumes of controlled crude, outside refinery accounts for entitlements purposes.

*Id.* at p. J–38.

**19.** *Id.* at pp. 101–02.

**20.** The Validation Study uncovered no evidence of miscertification. *Id.* at p. 100. Moreover, it compared the practice of miscertification to that of manipulative inventorying, and of the latter concluded: "This practice is essentially different from the incentives to misreport discribed [sic] in this Appendix. To a large extent the practice entails taking full advantage of the regulations." Appendix L at p. L–2.

crude carries with it the possibility of incurring civil and criminal liabilities.[21] *See* 10 C.F.R. § 205.203 (1980). As Murdock aptly stated in his testimony before the Court:

I think it's very unreasonable to assume that the magnitude of the disappearance that I have shown on these charts is a result of criminal action. Miscertification is a criminal act and while I don't doubt that there are criminals in the oil business, as well as any other business, it is inconceivable that disappearance of this magnitude could be the result of criminal acts and it would be inconceivable to imagine that oil companies would engage in criminal acts when exactly the same financial benefit could be obtained by a perfectly legal, or at least certainly not prohibited, application of the Department of Energy regulations. For that reason we are very convinced that the great bulk of the disappearance which has occurred in the last two years is, in fact, the result of this inventory manipulation.

Tr. at p. 87. Murdock added that miscertification more likely played a role in the disappearance of price-controlled crude before 1979; in other words, before the announcement of the coming of decontrol was made. At that time the average rates of disappearance were smaller, fluctuating between 2.5% and 4.0%. Tr. at pp. 86–7.[22] This is probably because before the announcement of decontrol refiners had limited options available to them to "game" the entitlements program. As a result, they would be more likely to turn to more desperate means, such as miscertification, to profit from selling price-controlled crude oil as uncontrolled crude. Of course, after the announcement of the coming of decontrol, they could in addition "game" the entitlements program to make even greater margins of profit.

A final factor that increases the likelihood that manipulative inventory practices were the primary cause of the large quantities of price-controlled crude after 1979, is the substantial "reappearance" of similarly large quantities of uncontrolled crude.[23] As indicated already, a comparison of the First Purchasers Reports and the entitlements program data reveals that uncontrolled crude was reappearing after the announcement of decontrol in greater amounts than had been reported even as being produced in the same time period. This finding is consistent with the use of "selective inventorying," "time exchanges," and "splitting entitlements." Each of these practices would enable a refiner to hold price-controlled crude outside of the refinery, and thereby avoid the entitlements obligation, while permitting the refiner to process more expensive uncontrolled crude. In sum, motivated by the opportunity to make "windfall" profits after decontrol, manipulative inventorying practices provided refiners with perfectly legal means to make such profits. A comparison of the First Purchaser's Reports and entitlements program data would seem to verify that refiners took advantage of this opportunity. Tr. at pp. 77–80.

While understandably reluctant to admit it, for at least four years now the DOE has

---

**21.** This may explain why between 1974–1977, the DOE has issued only $83.5 million in "Notices of *Probable* Violations" (emphasis supplied), on a total entitlements obligation of $39 billion for the same period. Validation Study at p. 61.

**22.** The Validation Study found insignificant amounts of miscertifications during that period:

Audits by DOE (Enforcement and the Office of Special Counsel) of entitlements records have similarly found a relatively small volume of violations. It was estimated that less than 0.5 percent of total reported volumes and/or entitlements benefits—see Chapter III, Part E.2.b. Enforcement audits as of February, 1978 determined that for the period November, 1974 to December, 1976, old oil receipts were understated by less than 720,000 (approximately 5,600 barrels per day), while new oil receipts were overstated by about 240,000 barrels (approximately 19,000 barrels per day). On the other hand, preliminary audits of five resellers conducted by ERA in 1977, indicated that approximately 50,000 barrels per day of old oil were being certified as new oil.

*Id.* at pp. 100–101 (footnotes omitted).

**23.** *See supra*, note 18; *see also* Validation Study at pp. 94–95; Exh. # # 18 and 19.

been keenly aware of the problem of disappearing price-controlled crude oil, and the fact that literally millions of barrels of price-controlled crude have not been accounted for in the entitlements program. On April 15, 1977, some two years before the announcement of decontrol, a Mobil vice-president, Bonner H. Templeton, wrote to J. F. O'Leary, administrator of the FEA, to complain about the problem of the disappearance of price-controlled crude. Templeton stated in his letter that for the twelve months commencing February 1976, a comparison of the First Purchasers Reports and entitlements program data revealed a 1.0% disparity in the quantities of "old oil" reported. In addition, Templeton stated:

> Assuming such conversion is solely to upper tier crude, this difference of 1% represents an overall increase in industry crude costs to refiners of about $0.5 million per day, or $190 million per year. Again, assuming that there is no mathematical or other explanation for this difference the mechanics of the Entitlements Program are such that the industry's crude costs are being increased. The end result is an apparent windfall to a few individual firms at the expense of others.

He concluded his letter by requesting that the DOE conduct a thorough investigation of the problem.

In response to Templeton's letter, Gorman C. Smith, Acting Deputy Administrator of the FEA, wrote back in a letter dated May 19, 1977, that the problem of the variances in data between the two systems was a concern to the FEA, and that "a thorough analysis and review of the data is being conducted." By June of 1977, this investigation had been completed, and a report entitled "Survey of the Disappearance of Old Oil" (1977 Survey) was submitted to Administrator O'Leary from Wayne W. Porter of the FEA's Office of Compliance Operations and Regulatory Programs. To assess the problem of disappearing price-controlled crude, the 1977 Survey compared the First Purchasers Reports with the entitlements program data for two periods:

from February through December 1976, and from January through April 1977. The 1977 Survey made the following findings:

> A comparison of this data for the period February through December 1976 showed that first purchasers reported 89,000 barrels per day (B/D) more of lower tier crude (old oil) than was reported by the refiners. In the same period 85,000 B/D more upper tier crude was reported by the refiners than was reported by first purchasers.
>
> The disappearing old oil problem has grown recently. Between January and April 1977 refiners reported 201,000 B/D less old oil than the first purchasers. Upper tier crude receipts reported by the refiners exceeded that reported by first purchasers by 82,000 B/D. An additional 119,000 B/D of old oil reported by first purchasers were not reported in refiner receipts.

*Id.* at p. 1.

The 1977 Survey went on to state that the problem of disparities between the two data systems had "remained at essentially the same level throughout the period of comparison." *Id.* However, it concluded that there was "no clear explanation for this sudden growth in 'disappearing' old oil." *Id.* The 1977 Survey, nevertheless, did isolate "potential causes" of the problem as being "erroneous reporting" and "regulatory loopholes." *Id.* at p. 2. Specifically, the 1977 Survey found that miscertifications of tier categories "account for a significant portion of the old oil which has become upper tier." *Id.* Also uncovered were "inconsistencies and definitional problems in reporting crude receipts involving [time] exchanges." *Id.* Still another cause of the disappearance of price-controlled crude was traced to the fact that there was no requirement in the entitlements program that crude oil used for non-refining purposes be reported. The 1977 Survey stated: "Consequently, the volumes of old oil used by refiners for fuel, as well as the old oil sold by resellers to firms which do not refine the oil, disappear from the reporting system." *Id.* at p. 4. This practice, is, of

course, consistent with "splitting entitle-ments." See *supra*, at p. 436.

A year later, the same data collected in the 1977 Survey, was again analyzed by a separate DOE sub-agency in a report enti-tled "Background Paper on the Disappear-ance of Old Oil," dated March 14, 1978; internal memorandum for Lincoln E. Moses by Charles E. Smith. (1978 Paper). This additional study confirmed each of the con-clusions made in the 1977 Survey. First, that in conjunction with the disappearance of "old oil," "new oil" was reappearing in the entitlements program. *Id.* at p. 6.[24] And second, that the rate of disappearance had increased during the February through January 1977 period, such that "old oil" was not only reappearing, but it was disappear-ing from the entitlements system altogeth-er. *Id.* at p. 7.[25] Third, the 1978 Paper attributed these statistics primarily to mis-certifications of crude oil tiers, and secon-darily to misreporting due to time ex-changes and crude oil used for non-refining purposes. *Id.* at pp. 10–12.

As already described in this Memoran-dum-Decision, the DOE also undertook to commission an independent study of the problems in the entitlements program's data systems. This study has been complet-ed and is entitled "Validation of the Crude. Oil Entitlements Information System," dat-ed March 9, 1981. (Validation Study). In assessing the performance of the entitle-ments program's data system, the Valida-tion Study compared the First Purchaser Reports with entitlements program data for the years 1977 through 1979. The Valida-tion Study observed: "We found, as other previous investigations have, [citing the two previously mentioned studies among others] that the volumes of domestic crude reported as old oil on [First Purchasers Reports] are larger than those reported on the [entitle-ments program data] system. . . . The missing old oil is approximately 241 million barrels, or an average of 220,000 barrels per day over the 1977–1979 period." *Id.* at pp. vi–viii. The Validation Study concluded as follows:

> To the extent that nonrefining invento-ries consist of crude oil reported to the First Purchaser System as old oil but not to the DCOE, then these volumes would seem to have "disappeared." If it is as-sumed that firms will seek to minimize their inventory costs and maximize the value of an entitlement, then it would be to their advantage to have these invento-ries consist mainly of the cheaper price controlled crude oil. With the advent of decontrol, those companies that have con-siderable inventories of old oil will be able to sell the oil at uncontrolled prices, which are four or five times greater than the purchase price of old oil. Companies that did not follow such a practice will more than likely be at a competitive dis-advantage, but we are unable to qualify this problem.

*Id.* at pp. ix–x.[26]

On December 16, 1980 Allen E. Murray, President of the Marketing and Refining

---

24. According to the 1978 Paper:

> A comparison of these data for the period February 1976 through January 1977 showed that the first purchasers reported 108,000 barrels per day more of old oil than was reported by the refiners. For this same peri-od of time, the first purchasers reported 91,-000 barrels per day less of new oil than was reported by the refiners.

*Id.* at p. 6.

25. [the date] indicates that, although the amount of old oil which turned into new oil has remained relatively stable (approximate-ly 1.20% of total crude oil), the amount of crude oil which has "disappeared" from the system altogether has increased markedly (from –.22% to 1.71%).

1978 Paper, at p. 8.

26. *See also* Affidavit submitted by Barton R. House, Acting Administrator of the ERA, in *Metzenbaum v. Edwards*, Civil Action No. 81–405 (D.D.C. filed February 19, 1981). In a related context, Mr. House gave testimony in support of the President's decision to order decontrol without notice and comment. In this regard, Mr. House stated:

> If the effective date of the decontrol order had been deferred pending notice and com-ment, producers, resellers and refiners of price-controlled crude oil could have been expected to engage in various forms of stock-piling and hoarding in order to capture the benefits of selling the crude oil at uncon-trolled prices once the decontrol order be-

Division of Mobil wrote to the Secretary of Energy about the increasing rate at which price-controlled crude was disappearing "in the last few months." Murray stated in his letter that "[t]he total controlled oil disappearance as reported through September by DOE now amounts to over half a million barrels per day or 6 percent of total U. S. production. These losses of controlled crude are largely offset by increases in the volume of refiner stripper oil receipts." Deputy Secretary Lynn R. Coleman responded in a January 19, 1981 letter to Murray, in which he stated that "I have asked the Office of Special Counsel for Compliance to look into this matter. As the Office responsible for monitoring the compliance of the 35 largest refiners with the Department's pricing and allocation regulations, the Special Counsel's office is particularly interested in this problem." ·

Mobil claims that despite its repeated attempts to bring the problem of disappearing crude oil to the DOE's attention over the course of four years, those efforts proved futile. Undeterred, nevertheless, Mobil then petitioned the Economic Regulatory Administration of the DOE to institute an emergency rulemaking proceeding to take comments on a proposed regulation that would impose an entitlements obligation on every barrel of price-controlled crude oil received though not reported by refiners and resellers between November 1, 1974 and January 28, 1981. In its petition, Mobil described the proposed amendments as follows:

> The purpose of these amendments is to ensure that, with the abrupt termination of federal price controls on the production and sale of domestic crude oil, the benefits, as well as the burdens, of such regulations have been borne equitably by all affected parties including consumers. Abrupt termination without full accountability by each refiner and reseller for price-controlled crude oil held in inventory on the date of decontrol will result in an unwarranted windfall to some firms at the expense of other companies and consumers.

February 10, 1981 Petition for Emergency Rulemaking Regarding the Domestic Crude Allocation Program, at p. 1; Defendants' Exhibit A. The DOE informs the Court that Mobil's Proposed Rulemaking remains under consideration. On March 12, 1981 Mobil also filed an appeal of the DOE's December, 1980 entitlements notice with the DOE's Office of Hearings and Appeals (OHA), and a decision on this appeal is still pending. Mobil has, in addition, filed a request to stay the January entitlements notice pending a decision on its appeal, but the OHA has not responded to this request within its regulatory mandated time period of ten working days. See 10 C.F.R. § 205.-199(h)(i) (1980).

Accordingly, Mobil filed this action on April 10, 1981 and seeks a declaration from this Court that the DOE's post-decontrol entitlements notices are unlawful. Mobil additionally prays for injunctive relief to prevent the DOE from issuing any further entitlements notices, until such notices fully take into account all price-controlled crude oil produced and sold between November 1, 1974 and January 28, 1981. Mobil contends that due to the manipulative practices of certain entitlements program refiners, entitlements notices as presently contemplated by the DOE are woefully inaccurate. The DOE's refusal to take corrective measures, says Mobil, is arbitrary, capricious, an

---

came effective. The benefits to producers, resellers and refiners of such delay during the rulemaking period could have been substantial. As of December 1980, lower tier crude oil was selling to refiners for an average of $7.49 per barrel and upper tier crude oil was selling for an average of $15.51 per barrel. The market price of crude oil at that time was $34.55. Therefore, the expected additional profit to be gained by withholding old oil would be $27.06 per barrel and $19.04 per barrel for upper tier crude oil. Companies could have withheld price controlled crude oil from the market, for example, by reducing present production levels, modifying their standard inventory procedures, using all available storage tank capacity, and hiring and filling oil tankers to capacity for use as storage.

Affidavit of Barton R. House, ¶ 4 (February 24, 1981); annexed to plaintiff's complaint as Exhibit C.

abuse of the DOE's discretion, and in excess of its statutory authority under the Emergency Petroleum Allocation Act, *as amended*, 15 U.S.C. § 751, *et seq*. Lastly, Mobil argues that unless it is granted a preliminary injunction to protect the status quo, it will suffer immediate irreparable harm because it would never be able to recoup its lost revenues. Before the Court may address the merits of plaintiff's claims, defendant's motion to dismiss must first be considered.

## IV.

The DOE has moved to dismiss plaintiff's complaint, and has put forward three separate, but related grounds. The first of these is that Mobil has failed to exhaust its administrative remedies. The DOE argues that Mobil has already raised the instant claims before the DOE in the form of a petition for emergency rulemaking, and an appeal before the OHA. Since both the petition and the appeal remain under consideration by the DOE's relevant sub-agencies, and either could afford plaintiff all of the relief which it seeks in its complaint, the DOE contends that judicial review of these issues at this time would be premature and a waste of judicial resources. According to the DOE, the provinces of this Court are ill-suited to conduct an investigation and audit of the entitlements program, or to assess the implications of the various manipulative practices alleged by plaintiff. The DOE maintains that "This is obviously an area in which the initial factfinding and application of the regulations must be left to the agency prior to any involvement by the courts." Defendant's Memorandum in Support of Motion to Dismiss at p. 6. And finally, the DOE says that in addition to the administrative procedures outlined above, plaintiff has not undertaken to apply for "exception relief" to "prevent special hardship, inequity, or unfair distribution of burdens." 10 C.F.R. § 205.50 *et seq*. (1980). The DOE maintains that this form of relief is especially appropriate here since plaintiff claims that the impact of the regulatory scheme will have severe economic consequences on its operation.

Traditionally it has been held by the courts that a party will not be permitted to pursue judicial relief until available administrative remedies have been exhausted. *See e. g. Parisi v. Davidson*, 405 U.S. 34, 37–8, 92 S.Ct. 815, 817–18, 31 L.Ed.2d 17 (1972); *McKart v. United States*, 395 U.S. 185, 187, 193, 89 S.Ct. 1657, 1659, 1662, 23 L.Ed.2d 194 (1969). *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938); *see generally*, 5 Mezines, Stein & Gruff, *Administrative Law*, § 49.01 (1979). The underlying purposes of the doctrine of exhaustion are multifold and have been summarized in *McKart v. United States, supra* at 193–95, 89 S.Ct. at 1662–63, as follows: (1) to avoid premature interruption of the administrative process; (2) to permit the agency to develop the necessary factual background upon which decisions must be based; (3) to enable the agency to exercise its discretion or administrative expertise; (4) to improve the efficiency of the administrative process; (5) to conserve increasingly scarce judicial resources; (6) to provide an agency with the opportunity to discover and correct its own orders; and (7) to avoid the possibility that "frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *See also Hawthorne Oil & Gas Corp. v. DOE*, 647 F.2d 1107 at 1113–1114 (Em.App.1981); *Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 575–77 (2d Cir. 1979); *Diapulse Corp. v. Food & D. Admin.*, 500 F.2d 75, 77 (2d Cir. 1974).

██ However, in the absence of these factors, or in exceptional circumstances, a plaintiff will not be pressed to fulfill the exhaustion requirement. Thus, when the prescribed administrative remedy is plainly inadequate, for instance, due to unreasonable administrative delay, exhaustion is unnecessary. *Walker v. Southern Railway*, 385 U.S. 196, 198, 87 S.Ct. 365, 366, 17 L.Ed.2d 294 (1966); *United States Alkali Export Ass'n v. United States*, 325 U.S. 196, 210, 65 S.Ct. 1120, 1128, 89 L.Ed. 1554

(1945). A plaintiff, moreover, will not be required by a court to exhaust administrative remedies when irreparable harm would result. *See Hawthorne Oil & Gas Corp. v. DOE, supra* at p. 1114; *Touche Ross & Co. v. S.E.C.,* 609 F.2d 570, 576 n.11 (2d Cir. 1979). Neither will the doctrine of exhaustion be held to apply in the situation where the agency has clearly acted in excess of its statutory authority. *Leedom v. Kyne,* 358 U.S. 184, 188–91, 79 S.Ct. 180, 183–85, 3 L.Ed.2d 210 (1958); *Hawthorne Oil & Gas Corp. v. DOE, supra* at p. 1114; *Touche Ross & Co. v. S.E.C., supra* at 575–76. And lastly, exhaustion will not be required where to do so would be futile, such as where the very administrative procedure under attack is the one that the agency says must be exhausted. *Hawthorne Oil & Gas Corp. v. DOE, supra* at p. 1114; *Nat. Conservative Political v. Fed. Election,* 626 F.2d 953, 957 (D.C.Cir.1980) (per curiam); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692 (D.C.Cir.1975); *Touche Ross & Co. v. S.E.C., supra* at 577; *Finnerty v. Cowen,* 508 F.2d 979, 982–83 (2d Cir. 1974); *Davis v. Bolger,* 496 F.Supp. 559, 567 (D.D.C.1980). In weighing these factors and balancing the relative interests involved, the applications of the exhaustion doctrine are within the sound discretion of the court. *NLRB v. Marine Workers,* 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 1722 n.8, 20 L.Ed.2d 706 (1968).

■ With regard to the instant case, the Court does not believe it is necessary for plaintiff Mobil to further exhaust its administrative remedies. At this juncture some additional clarification of the issues in this case is appropriate. The central issues in this dispute may be summarized as follows: (1) Have substantial quantities of price-controlled crude oil disappeared from the entitlements program since its inception through the date of decontrol, such that the DOE's entitlements notices have not reasonably accounted for all price-controlled crude produced and sold during the life of the entitlements program. (2) If substantial quantities of price-controlled crude have disappeared and affected the reasonable accuracy of these notices, would the DOE exceed its statutory authority by issuing post-decontrol entitlements notices which it knows do not reasonably account for the price-controlled crude that has disappeared. (3) Will plaintiff suffer irreparable harm as a result of the issuance of post-decontrol entitlements notices which do not reasonably account for the price-controlled crude oil that has disappeared, and which, therefore, are not reasonably accurate.

As for the first of these issues, evidence submitted at the May 12, 1981 hearing on plaintiff's motion for a preliminary injunction conclusively demonstrates that in the years 1979 and 1980, approximately 250 million barrels of price-controlled crude disappeared from the entitlements program. The evidence also revealed that, as a result, some $5.6 *billion* worth of entitlements obligations were not channeled through the entitlements program. The DOE did not present any evidence at the preliminary injunction hearing to dispute these statistics. In fact, the DOE has totally conceded these points in its written submissions to the Court. *See* Defendants' Memorandum in Support of the Motion to Dismiss, at p. 7. Furthermore, the DOE does not dispute that the disappearance of price-controlled crude has caused substantial and unnecessary burdens to befall entitlements program refiners. Nor even does it contest that the issuance of post-decontrol entitlements notices in the form contemplated will exacerbate that burden.

But instead of conceding as well that the above admissions would tend to raise questions about whether the DOE has exceeded its statutory authority by issuing these inaccurate post-decontrol notices, the DOE has taken a different tack in this litigation. It seems to be saying that because it has not ascertained the exact causes for the disappearance of price-controlled crude, or decided what to do about the problem, plaintiff has failed to exhaust its administrative remedies. In the Court's view, not only do these contentions obfuscate the issues as stated above, they also misstate the record. For the moment the relevant in-

quiry does not concern the possible reasons for the disappearance of the price-controlled crude, or what actions the DOE should have taken or could take to eradicate the problem. Rather, the question in chief, and restated necessarily in view of the DOE's concessions, is whether the DOE has now exceeded its statutory authority by issuing the post-decontrol entitlements notices, while knowing full-well that such notices are not reasonably accurate, and would lead to further increase the already substantial and unnecessary burden of entitlements refiners.

As a consequence, despite the fact that the DOE continues to investigate the causes for the disappearance of price-controlled crude, though perhaps admirable, this would have no bearing on the exhaustion issue before the Court. What is essential is that the DOE is about to issue post-decontrol entitlements notices, and in so acting has arguably exceeded its statutory authority. Plaintiff claims that it will be irreparably harmed as a result. To be considered for exhaustion purposes, therefore, is whether plaintiff may now seek a judicial remedy. The Court believes that when the issue in this case is framed properly in this fashion, the above query must be answered in the affirmative. The Supreme Court dealt with a related situation in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). In that case the National Labor Relations Board had purportedly acted in excess of its authority when it certified a collective bargaining unit without permitting all interested employees to vote on the question. The Court found the exhaustion doctrine inapplicable and stated: "This suit is not one to 'review,' in the sense of that term in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific provision of the Act." *Leedom v. Kyne*, 358 U.S. 184, 186, 79 S.Ct. 180, 182, 3 L.Ed.2d 210 (1958); *see also McCulloch v. Sociedad Nacional*, 372 U.S. 10, 17, 83 S.Ct. 671, 675, 9 L.Ed.2d 547 (1962). The instant case falls within this well-settled exception to the exhaustion re-

quirement. Specifically, whether the DOE acted "plainly beyond its jurisdiction" in deciding to issue post-decontrol entitlements notices which it knew were not reasonably accurate. *See Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 575 (2d Cir. 1979); *Sterling Drug, Inc. v. Weinberger*, 509 F.2d 1236, 1239 (2d Cir. 1975).

Flowing from these conclusions is that none of the purposes of the exhaustion requirement would be served by deferring to the DOE. The instant case does not present a situation where, by permitting judicial review, the administrative process would be prematurely interrupted. Based on the foregoing, it is clear that plaintiff complains herein of an administrative decision that has been completed. This Court may enjoin the effect of that decision, but in so doing, it would not be enjoining the administrative decision-making process. *See Touche Ross & Co. v. S.E.C.*, 609 F.2d at 576. It would also appear that there would be little use for additional development of a factual record since the issue here is the reasonableness of the DOE's conduct as based on existing facts. Moreover, a further sounding of the DOE's expertise in this matter would not be productive. The issues raised in this case are primarily legal. For example, one of the DOE's arguments is that it has no discretion in issuing the post-decontrol entitlements notices because it is required to do so by applicable regulations. This is a purely legal judgment on the part of the DOE, and it may properly be reviewed by the Court. *See Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 577 (2d Cir. 1979); *Consumers Union v. Cost of Living Council*, 491 F.2d 1396, 1399 (Em.App.) *cert. denied* 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974). Various other legal judgments also have been made by the DOE in reaching its decision on whether to issue the inaccurate entitlements notices. These include: the legal effect of President Reagan's oil industry decontrol order, *see* Executive Order No. 11287, 48 Fed.Reg. 9909 (January 28, 1981), and supra at p. 427, has had on the DOE's supposed legal obligation to issue post-decontrol entitle-

ments notices; the applicability of the underlying purposes of the Emergency Petroleum Allocation Act, 15 U.S.C. § 753 (b)(1); and whether entitlement program refiners would suffer irreparable harm if the DOE released entitlements notices which were not reasonably accurate.

In addition, it seems clear that remanding this case to the DOE would be futile. The DOE claims that it is legally required to issue the entitlements notices, and therefore would not provide plaintiff with a remedy. And in a situation such as the present case, where the very administrative procedure under attack—here the DOE's investigatory process—is the one which the agency claims must be exhausted, it has been held that the exhaustion doctrine need not be applied. *See Hawthorne Oil & Gas Corp. v. DOE, supra* at p. 1114; *Touche Ross & Co. v. SEC*, 609 F.2d at 577; *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 703 (D.C.Cir.1975); *Diapulse Corp. v. Food & Drug Admin.*, 500 F.2d 75, 78 (2d Cir. 1974). Finally, plaintiff claims that it will be irreparably harmed should the DOE be permitted to issue the contemplated post-decontrol entitlements notices. As will be addressed in greater detail *infra* at pp. 455–458, Mobile claims that in the years 1979 and 1980, it was forced to expend approximately $280 million as a result of the problem of disappearing price-controlled crude oil and the affect of this problem on the entitlements program. Mobil says that it will be unable to recoup these losses. Moreover, if required to comply with the January entitlements notice, Mobil estimates that it would have to further satisfy unnecessary obligations of $50 million. The Court believes that it is equally clear that Mobil will not be able to recoup these additional monies if the January entitlements notice is released. *See infra* at

pp. 455–458. The DOE's claim that plaintiff has not been irreparably harmed because the January notice has yet to be released is entirely frivolous. "The purpose of an injunction is to prevent future violations . . . ." *United States v. W. T. Grant*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). In the Court's view, plaintiff's alleged harm is indeed irreparable and the exhaustion doctrine ought not be applied.[27] *See Hawthorne Oil & Gas Corp. v. DOE, supra* at p. 1114; *Touche Ross & Co. v. SEC*, 609 F.2d at 576–77 n. 11.

■ As just described, the Court believes that the central issue in this lawsuit is whether the DOE exceeded its statutory authority when it decided to issue post-decontrol entitlements notices that it knew were not reasonably accurate, and that would substantially and unnecessarily burden entitlements program refiners. The Court further concludes that the DOE abused its discretion and acted in an arbitrary and capricious manner when it decided to issue said notices. This additional finding grows out of the DOE's mischaracterization of the status of its "investigation" into the problem of the disappearance of price-controlled crude oil. The DOE has attempted to suppress the fact that it has conducted and commissioned studies on this problem and its impact on the entitlements program. It has also sought to suppress the fact that these studies reached similar conclusions with regard to the dimensions of the problem of disappearing price-controlled crude oil, and the implications of this problem on the entitlements program refiners. Moreover, the DOE has pretended to disguise its own failure to investigate these issues after having been put on notice of the situation at least four years ago. The Court believes that the DOE's reasonably

**27.** In view of the fact that the DOE also argued before the OHA that plaintiff's appeal would not properly lie because plaintiff had failed to exhaust its administrative remedies, plaintiff is estopped from making that same argument before this Court. *See* Transcript of March 27, 1981 hearing before OHA, case no. BEA–0630, at pp. 96, 104, 107. Moreover, the DOE's suggestion that plaintiff has not exhausted its ad-

ministrative remedies because it has not petitioned for "exceptional relief" under 10 C.F.R. § 205.50 (1980) is misplaced. This regulation provides "the procedures for applying for exception from a regulation . . . ." 10 C.F.R. § 205.50(a)(1) (1980). Plaintiff has not sought to be excepted from the regulations, but only that they not be manipulated by others to plaintiff's detriment.

specific knowledge of the problem of disappearing price-controlled crude and the impact that this problem was having on the entitlements program, and its failure to make reasonable efforts to remedy this situation, bears directly on the reasonableness of the DOE's decision to issue the post-decontrol entitlements notices.

Although the DOE has represented that its investigation into the problem of the disappearance of price-controlled crude is still in its infancy, and that additional time is required to formulate a policy to address the problem, this summary of the DOE's investigatory efforts is not entirely truthful. As described earlier in this Memorandum-Decision, see supra at pp. 436–438 at least since June of 1977 when it first received the results of a study on the disappearance of price-controlled crude oil, the DOE was placed on notice that price-controlled crude oil was disappearing from the entitlements program, and that there were several likely causes for this result. A second study of this problem was conducted the following year and the same conclusions were reached concerning the problem and its causes. Moreover, the findings of both these studies were subsequently confirmed by a report dated March 9, 1981, which was the culmination of an independent study commissioned by the DOE. It would therefore appear that based on "investigations" it has conducted already into the problem of the disappearance of price-controlled crude oil, see supra at pp. 436–438, and its effect on the entitlements program, the DOE has had four years to formulate a reasonable and corrective response thereto.

Unfortunately through its inaction, the DOE has not formulated such a response. Instead, it has pursued three different courses of action. First the DOE has decided to proceed full steam with the release of the post-decontrol entitlements notices, and has ignored the serious inaccuracies contained therein. Second, despite the far reaching implications this decision has had on the entitlements program refiners, the DOE has sought to leave the impression that its decision to issue post-decontrol entitlements notices does not amount to a

policy determination on these implications. The DOE has also tried to cover-up the fact that each of the studies it has conducted or commissioned on the problem and causes of disappearing price-controlled crude oil, and its impact on the entitlements program, reported virtually identical results. By conveniently ignoring this fact, and by sitting back and feigning to be aware of the problem of disappearing price-controlled crude, though ignorant of its "actual" causes and possible solutions, the DOE has attempted to fend off judicial intervention into a problem it likely caused in the first place. Furthermore, it has pursued this course all the while claiming that its expertise should be deferred to because of the complexities of the issues involved.

It may be true that the DOE will need to conduct additional investigations into the causes of the disappearance of price-controlled crude oil in order to reach a conclusive understanding of the problem and to be able to devise a solution thereto. However, despite the DOE's claims to the contrary, this fact bears little on the instant inquiry. For the DOE's course of conduct is potentially an abuse of discretion and arbitrary and capricious because: (1) in fact through the investigations it has completed already, the DOE does have sufficient facts within its possession to form a reasoned judgment as to whether or not post-decontrol entitlements notices should be issued. From those investigations the DOE has reasonably detailed knowledge of the extent of the problem of disappearing price-controlled crude oil, the probable causes of this problem, and the resulting harm that has been caused to entitlements program refiners. (2) The DOE has only itself to blame in failing for four years to conduct additional or conclusive investigations into the problem of disappearing price-controlled crude oil and its effect on the entitlements program. Moreover, the DOE's failure to do so must bear on the reasonableness of its stated intention to issue further entitlements notices before it proceeds to complete its "investigation" of the problem of disappearing price-controlled crude.

In view of the foregoing, the Court believes that the doctrine of exhaustion should not be applied. Even with the "limited" knowledge in its possession, it is unreasonable at this late date for the DOE to claim that it is not reasonably certain about the dimensions of the problem of disappearing price-controlled crude oil, the likely causes of the problem, and the impact it has on the entitlements program. If the DOE believes that additional information is required for a conclusive understanding of the situation, it has had four years within which to seek out that information. In contrast, the Court is convinced that judicial review of the reasonableness of the DOE's decision to issue post-decontrol entitlements notices is entirely appropriate at this juncture. If the Court were to defer to the DOE and require the plaintiff to further exhaust its administrative remedies, the DOE would probably continue to unfairly claim that it must be advanced additional time to investigate these problems. In short, this additional time would have the practical effect of insulating the DOE from judicial scrutiny. It should be remembered that the entitlements program is being phased-out. Thus, a review of the immediate events would take advantage of the last opportunity to possibly improve the efficiency of the administrative process.

■ Judicial intervention at this time would not, moreover, encourage the flouting of the administrative process. Besides the fact that the DOE would appear to be guilty of this itself, the plaintiff here seeks to realign the original intentions of the instant regulatory scheme. Furthermore, in view of the DOE's past action or non-action, exhaustion at this time would be ill-advised. It is well settled that the exhaustion requirement need not be invoked where, due to excessive delay in deciding an issue, an agency's remedy would prove inadequate. *See Walker v. Southern Railway,* 385 U.S. 196, 198, 87 S.Ct. 365, 366, 17 L.Ed.2d 294 (1966). Any supposed remedies the DOE could eventually devise would come only after the post-decontrol entitlements notices had already been released. However, as will be discussed *infra* at pp.

455–458, once an entitlements notice is issued and entitlements obligations have been satisfied, it is virtually impossible to "unscramble the eggs" of this process to remedy a particular refiner's claim that it has been disproportionately burdened. And since the DOE insists upon issuing the post-decontrol notices in their contemplated form without accounting for the price-controlled crude that has disappeared, it would seem that exhaustion in this case would be futile. The DOE has the authority to alter its present course of action, but appears unlikely to do so in the immediate future. *See Hawthorne Oil & Gas Corp. v. DOE, supra* at p. 1114. In sum, the DOE's motion to dismiss plaintiff's complaint on the ground of failure to exhaust administrative remedies is denied. The next issue that will be addressed is defendants' claim that plaintiff has failed to satisfy the ripeness doctrine.

The DOE also argues that plaintiff's complaint should be dismissed for failure to satisfy the ripeness doctrine. According to the DOE, the instant case is not ripe for judicial review because plaintiff is asking the Court to enjoin actions, more particularly, the issuance of post-decontrol entitlements notices, which have yet to occur. The DOE further asserts that to verify the various manipulative practices of which plaintiff complains will require the DOE to conduct "factual" investigations. Consequently, the DOE claims that this case is not ripe for judicial review. And lastly, the DOE argues that there is no final agency action capable of being reviewed. Since the investigation of plaintiff's claims have not been completed, the DOE contends that review by the Court at this time would be premature.

The ripeness doctrine is related to the exhaustion requirement because each is designed to assist a court in determining when, if at all, it should inject itself in the administrative process. *See Aquavella v. Richardson,* 437 F.2d 397, 402 (2d Cir. 1971). The Supreme Court described the ripeness doctrine in the case of *Abbott Laboratories v. Gardner,* as follows:

[the] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

387 U.S. 136 at 148–49, 87 S.Ct. 1507 at 1515, 18 L.Ed.2d 681. The Supreme Court went on to explain that an issue would be fit for judicial resolution if it involved "legal" as opposed to "factual" determinations. *Id.* at 149, 87 S.Ct. at 1515. Moreover, the Court stated that to be fit for judicial resolution the agency's action must be "final" as interpreted in a "pragmatic way." *Id.* at 149, 87 S.Ct. at 1515. As for the hardship requirement, the Court held that this was satisfied if the challenged action had an immediate and substantial impact upon the complaining party. *Id.* at 150, 87 S.Ct. at 1516. Finally, the Court said that also to be considered is whether judicial review would impede effective enforcement of the administrative scheme. *Id.* at 154, 87 S.Ct. at 1518. *See also Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Central Hudson Gas v. United States,* 587 F.2d 549 (2d Cir. 1978); *Nat. Resources Def. Council v. U. S. Nuclear Reg. Com'n,* 539 F.2d 824 (2d Cir. 1976); *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107 (D.C.Cir.1974) (en banc); *Aquavella v. Richardson,* 437 F.2d 397 (2d Cir. 1971).

With regard to the instant case and whether the issues raised by plaintiff's complaint are legal or factual, as the Court's previous discussion of the doctrine of exhaustion would indicate, the issues involved here are primarily legal. Plaintiff complains that the DOE has exceeded its statutory authority and abused its discretion in issuing post-decontrol entitlements notices

that it knew were not reasonably accurate. In the main, this type of determination has been interpreted to be legal in nature, *see Abbott Laboratories v. Gardner, supra* 387 U.S. at p. 149, 87 S.Ct. at p. 1515; *see generally* Administrative Law, § 49.01 (1979), and would not require the application of the DOE's expertise. *Id.* at 149, 87 S.Ct. at 1515; *see also Central Hudson Gas v. E. P. A.,* 587 F.2d 549, 558 (2d Cir. 1978); *Independent Bankers Ass'n of America v. Smith,* 534 F.2d 921, 927 (D.C.Cir.1976); *Aquavella v. Richardson, supra* at p. 404.

In addition, the Court believes that plaintiff has satisfied the finality element of the ripeness doctrine. According to the Supreme Court's holding in *Abbott,* agency action will be considered to be final where, for example, the promulgation of regulations by the agency " 'and the expected conformity to them causes injury cognizable by a court of equity....' " 387 U.S. at 150, 87 S.Ct. at 1516. The Court has already stated in the examination of the exhaustion doctrine that the DOE's intention to issue post-decontrol entitlements notices will be a source of immediate irreparable injury to plaintiff. *See also infra* at pp. 455–458. Moreover, based upon the information the DOE possessed as a result of their "investigations" into the problem of disappearing price-controlled crude oil, its failure to stay the issuance of the entitlements notice pending the implementation of some corrective measures to reasonably account for the price-controlled crude that has disappeared, must be deemed final action. As a primary matter, the Court need not be bound by the DOE's use of the term "investigation." In *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 124 (D.C.Cir.1974) (en banc) the court held: "The label an agency attaches to its action is not determinative. The action may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect." *See also Aquavella v. Richardson, supra* at 403. The DOE's general recalcitrance to investigate the problem of disappearing price-controlled crude, and then after having done so, to admit that it had,

seems no less than a formal policy by which the DOE has sought to protect itself from being subject to judicial scrutiny. The Court believes that under the Supreme Court's "pragmatic" and "flexible" approach to the question of finality, for purposes of the present case, "the administrative action has reached its complete development." *Abbott Laboratories v. Gardner,* supra 387 U.S. 149–50, 87 S.Ct. at 1515–16; *Central Hudson Gas v. E. P. A.,* 587 F.2d at 558–59; *Natural Resources Defense Council v. United States Nuclear Regulatory Commission,* 539 F.2d at 837; *Aquavella v. Richardson,* 437 F.2d at 404.

█ Plaintiff has also satisfied the "hardship" element of the ripeness doctrine. In effect, plaintiff has been faced with a Hobson's choice due to the DOE's actions in issuing the post-decontrol entitlements notices. Thus, plaintiff may either comply with the entitlements program's obligations and be forced to pay unnecessarily $50 million into the program—a sum it probably will never be able to recoup—or ignore what it considers to be the illegal application of regulations and face the possibility of both civil and criminal penalties. *See Abbott Laboratories v. Gardner, supra* 387 U.S. at p. 152, 87 S.Ct. at p. 1517; *Independent Bankers Ass'n of America v. Smith,* 534 F.2d at 929; *Continental Airlines v. C. A. B.,* 522 F.2d at 126; *Aquavella v. Richardson,* 437 F.2d at 404. Plaintiff is also being subject to hardship within the meaning of the ripeness doctrine because of its claim that the DOE has exceeded its authority in requiring plaintiff to comply with the post-decontrol entitlements notices. *See Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 176, 87 S.Ct. 1526, 1531, 18 L.Ed.2d 704 (1967); *Central Hudson Gas v. E. P. A.,* 587 F.2d at 549. The Court further notes that with the entitlements program coming to an end, this may be one of the last opportunities to review the questionable legality of the past and present operations of the program. Since plaintiff contends that billions of dollars of entitlements obligations have been improperly withheld from the program, there is a strong public interest in favor of maintaining this lawsuit. First,

other refiners are probably similarly situated to plaintiff and would stand to benefit from an audit of the entitlements program. Second, the American public may also gain from this endeavor because the disappearance of price-controlled crude enables refiners to reap "windfall" profits at the public's expense. In this sense, plaintiff's lawsuit may be construed as a means by which the entitlements program may be placed once again on track. *See Natural Resources Defense Council v. United States Nuclear Regulatory Commission,* 539 F.2d at 837; *Independent Bankers Ass'n of Am. v. Smith,* 534 F.2d at 929–30; *Aquavella v. Richardson,* 437 U.S. at 404. In conclusion, the Court believes that the instant law suit is ripe for judicial scrutiny.

█ The DOE further asks that the Court remand this matter pursuant to the doctrine of primary jurisdiction. According to the DOE, it is currently considering in various administrative actions the exact same issues that are now before the Court. However, the DOE asserts that plaintiff's claims require the resolution of various factual determinations that would benefit from the DOE's expertise. The DOE therefore requests that the Court retain jurisdiction over this matter, but remand it to the DOE for additional proceedings. Stated generally, the primary jurisdiction doctrine "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Nader v. Allegheny Airlines,* 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976) *citing United States v. Western Pacific R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956). The doctrine envisions permitting the interested administrative body to pass on those issues raised in a party's claim that are peculiarly within the competency of the agency for resolution. The benefit perceived by this process is that of encouraging the "uniformity and consistency in the regulation of the business entrusted to the particular agency." *Far East Conf. v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). *See also Nader v.*

*Allegheny Airlines, supra* 426 U.S. at 303–04, 96 S.Ct. at 1986–87; *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). At the same time, judicial efficiency is also well-served by this doctrine:

> [the] limited functions of the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Far East Conference v. United States, supra* 342 U.S. at pp. 574–75, 72 S.Ct. at p. 494. *See also United States v. Western Pacific R. Co.*, 352 U.S. 64, 65, 77 S.Ct. 165, 166, 1 L.Ed.2d 126 (1956).

There are no hard and fast rules in applying the doctrine of primary jurisdiction. "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Id. at 64, 77 S.Ct. at 165. Thus, where the issue involved in a case is purely legal, a court need not defer to the agency for its initial determination. *See Board of Education of City School Dist. v. Harris*, 622 F.2d 599, 607 (2d Cir. 1979). It has been equally well recognized that the doctrine need not be invoked where "resort to the agency would plainly be unavailing in light of its manifest opposition or because it has already evinced its 'special competence' in a manner hostile to petitioner." Id. and cases cited therein. *See also United States v. Western Pac. R. Co., supra* 352 U.S. at p. 69, 77 S.Ct. at 167; *Klicker v. Northwest Airlines*, 563 F.2d 1310, 1313 (9th Cir. 1977).

In view of the facts and issues raised in this case, it would be ill-advised to stay the instant proceedings in favor of a determination by the DOE. First, it is evident that the DOE has already exercised its "special competence" in this matter, and with a result "hostile" to plaintiff. The DOE has left little room for speculation on the question of whether it intends to issue the post-decontrol entitlements notices despite acknowledging that they are not reasonably accurate, and that they would unnecessarily and unfairly burden the entitlements program refiners. In addition, the DOE has stated the position that it is unable to "help itself" to reverse this course. As the Court indicated, this issue and the other issues raised in this litigation are purely legal in nature and best resolved by a court of law as opposed to an administrative body. *See Shell Oil Co. v. Nelson Oil Co., Inc.*, 627 F.2d 228, 232 (Em.App.1980); *United States Tour Operators Ass'n v. Trans World Airlines, Inc.*, 556 F.2d 126, 130 (2d Cir. 1977). These principles have a special application to the present case since the DOE has been accused of exceeding its statutory authority and of having abused its discretion.

Moreover, the DOE's reluctance over the past four years to address the issues raised herein in a more meaningful fashion further militates against staying these proceedings. Four years seems sufficient time for the DOE to have developed a corrective "uniform policy" to those concerns raised by plaintiff's complaint. And finally to be considered is plaintiff's assertion that it has and will continue to suffer irreparable harm as a result of the DOE's stated intention to issue the post-decontrol entitlements notices. A stay of the instant proceedings will merely make the harm plaintiff alleges accomplished fact. In conclusion, defendants' motion to dismiss plaintiff's complaint or to stay the Court's proceedings in this case are denied in all respects. The Court turns now to address the merits of plaintiff's motion for a preliminary injunction.

V.

Mobil claims that it is entitled to a preliminary injunction to enjoin the issuance of the January entitlements notice. According to Mobil, the DOE has exceeded its statutory authority and abused its discretion by issuing post-decontrol entitlements notices, such as the one for January, that fail to account for all the price-controlled crude oil produced and sold between the

commencement of the entitlements program on November 1, 1974, and the date of decontrol of the petroleum industry on January 28, 1981. In so acting, plaintiff Mobil claims that the DOE has distorted the purpose of the entitlements program, which is to equitably distribute the economic benefits of having access to cheaper price-controlled crude oil. Mobil also asserts that this purpose has been subjugated through the non-action of the DOE in permitting certain refiners to manipulate the reporting of crude oil receipts so as to avoid the entitlements obligations. In addition, Mobil argues that for similar reasons as those above, the DOE has ignored the considered objectives of the Emergency Petroleum Allocation Act, *as amended*, 15 U.S.C. § 753(b)(1), which is the basis of the DOE's regulatory authority. And finally, Mobil contends that the failure of the post-decontrol entitlements notices to account for all of the price-controlled crude produced and sold during the course of the entitlements program, is in contravention of President Reagan's Executive Order No. 12287, 46 Fed.Reg. 9909 (January 28, 1981).

In response, the DOE argues that plaintiff is attempting to invalidate a regulatory scheme that has been upheld in the courts as being a proper exercise of statutory authority, and a reasonable exercise of the DOE's discretion. The DOE maintains that even assuming that plaintiff's claims of the existence of manipulative practices are correct, this problem is best handled by corrective rulemaking by the DOE, and by increasing enforcement efforts. As for the plaintiff's allegation that the purposes of the entitlements program have been undermined by the disappearance of crude oil, the DOE demurs and asserts that the program's purposes are still being served by the present manner in which it is being operated. The DOE states that a key purpose of the entitlements program is to equalize the "average weighted crude oil costs of all refiners, thereby eliminating the inequities caused by the 'two tier' pricing system." *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1395 (Em.App.1975). As such, the DOE contends that this purpose may be served no matter how much price-controlled crude oil remains in the program. The DOE argues that the reduction in volume of price-controlled crude oil in the program does not affect the relative positions of the participating refiners, any more than some individuals' efforts to avoid taxes increases the burden on other tax payers.

In any event, the DOE asserts that pursuant to applicable regulations, it has no choice but to issue the entitlements notices whatever the accuracy of the data they are based upon. The DOE also argues that the President's Executive Order No. 12287 merely requires the orderly phasing-in of decontrol, and does not provide for the retroactive invalidation of the entitlements program to the extent that notices covering time periods before the effective date of the Order are somehow invalidated by it. In sum, the DOE believes that Mobil seeks no less than to "blackmail the agency into writing a regulation which would retroactively amend the entire program to Mobil's benefit." Defendants' Supplemental Memorandum on Motion to Dismiss, at p. 7. The DOE urges that the Court not permit itself to be a party to those efforts.

 In addressing plaintiff's claims certain general principles must be kept in mind. The first is the applicable standard by which a preliminary injunction may issue. To be entitled to a preliminary injunction a plaintiff must demonstrate (1) probable success on the merits and possible irreparable injury; or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief. *See Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981); *Petraco-Valley Oil v. DOE*, 633 F.2d 184, 194 (Em.App.1980); *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980); *Jackson Dairy, Inc. v. H. P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979); *see also Sampson v. Murray*, 415 U.S. 61, 88 n.59, 94 S.Ct. 937, 952 n.59, 39 L.Ed.2d 166 (1974). With regard to plaintiff's claim that the DOE has exceeded its statutory

authority, the Court must, of course, examine the limits of the DOE's authority and compare them with the DOE's actions as shown by the evidence. *See* 5 U.S.C. § 706(2)(C); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 403, 416, 91 S.Ct. 814, 817, 823, 28 L.Ed.2d 136 (1971). A more clearly defined standard, however, is involved in plaintiff's allegations that the DOE has abused its discretion and acted in an arbitrary and capricious manner. *See* 5 U.S.C. § 706(2)(C). As the Supreme Court held in *Bowman Transportation v. Ark.-Best Freight System,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974):

> Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether there has been a clear error of judgment .... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' *Citizens to Preserve Overton Park v. Volpe, supra* [401 U.S.], at 416 [91 S.Ct. at 823]. The agency must articulate a 'rational connection between the facts found and the choice made.' *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

*See also Mobil Oil v. DOE,* 610 F.2d 796, 801 (Em.App.1979); *Office of Communication v. FCC,* 560 F.2d 529, 532 (2d Cir. 1977). More specifically, with regard to statutory construction, normally weight will be given to an agency's interpretation of its own enabling legislation, although the judiciary is the final authority on issues of statutory construction. *See Katharine Gibbs School v. FTC,* 612 F.2d 658, 664 (2d Cir. 1979), *citing Volkswagenwerk Aktiengesellschaft*

*v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *Manchester Environment Coalition v. EPA,* 612 F.2d 56, 58 (2d Cir. 1979); *Basin, Inc. v. FEA,* 552 F.2d 931, 934 (Em.App.1977). Still, an agency interpretation only must be granted great deference when it is consistent with the congressional purpose, and when there are no compelling indications that it is wrong. *Katharine Gibbs School v. FTC, supra* at 664; *Basin, Inc. v. FEA, supra* at 934; (no reasonable basis in law). With these doctrines in mind the Court will now examine the merits of plaintiff's claim for a preliminary injunction.

The Court's inquiry into the merits of plaintiff's claims, must begin first with a re-examination of the legislative history of the Emergency Petroleum Allocation Act (EPAA), *as amended,* 15 U.S.C. § 751 *et seq.,* which is the enabling statute for the entitlements program. *See* 39 Fed.Reg. 39740 (November 11, 1974). Pursuant to the EPAA, regulations promulgated thereunder shall *inter alia* "to the maximum extent practicable," 15 U.S.C. § 753(b)(1), provide for the "preservation of an economically sound and competitive petroleum industry," 15 U.S.C. § 753(b)(1)(F), the "equitable distribution of crude oil .... and refined petroleum products at equitable prices," *id.,* "economic efficiency," 15 U.S.C. § 753(b)(1)(H), and the "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." 15 U.S.C. § 753(b)(1)(I). From these roots sprang the entitlements program whose purpose is more specifically described in its legislative history:

> In large measure, the goal of the proposal is to improve the access of small and independent refiners to old domestic oil. In addition, however, the proposed program is also designed effectively to provide all refiners with proportionate amounts of old oil, based on their relative refinery capacities. The proposed program is accordingly aimed not only at bringing the small and independent refining sector as a class into a more competitive position with respect to the majors,

but it is also specifically designed to assure that all segments of the petroleum industry will benefit equally from lower-priced domestic oil.... This goal is consistent with the Congressional objectives of achieving equitable distribution of crude oil at equitable prices among all sectors of the petroleum industry and preserving an economically sound and competitive petroleum industry.

39 Fed.Reg. 39740 (November 11, 1974).

Upon juxtaposing both the intent of the enabling Act, and the legislative history of the entitlements program, it is apparent that the only possible means by which "equitable distribution" of price-controlled crude could be accomplished "to the maximum extent practicable," would be to guarantee the "access" of "all refiners" to "proportionate amounts of old oil based on their relative refinery capacities" such that they could "equally benefit from lower priced domestic oil." Obviously, if price-controlled crude oil, for some reason, was not funneled through the entitlements program and accounted for in the monthly entitlements notices, then the fundamental purpose of the program to "equitably distribute" price-controlled crude oil would be lost entirely. This observation is based, not on niceties of statutory construction, but on practical fact.

Unfortunately, the unthinkable has occurred. Evidence submitted to the Court by plaintiff and, significantly, not disputed by the DOE, conclusively demonstrates that at least since 1977 significant quantities of price-controlled crude oil have disappeared from the entitlements program only to reappear as more expensive uncontrolled crude, or to have simply vanished from the program altogether. Plaintiff has also demonstrated convincingly that decontrol, whether in its gradual form as announced by President Carter on April 5, 1979, or as completed by President Reagan on January 28, 1981, has had a certain speculative impact on the problem of disappearing price-controlled crude oil. The fastest rates at which price-controlled crude oil disappeared can be traced for similar reasons to these two dates. Spurred on by the incentive of the great price-differential between price-controlled and uncontrolled crude oil, the announcement of the eventual decontrol of the petroleum industry immediately encouraged refiners to hoard as much price-controlled crude as possible outside of the entitlements program for its eventual sale after decontrol. President Reagan's election brought with it the promise that decontrol would arrive even earlier than its originally scheduled date of October 1, 1981, and that profits could be taken sooner as well. This would explain why the most dramatic figures for the rates of disappearance are seen so far in November and December of 1980 (more recent statistics have yet to be released) when crude oil disappeared at the rate of 14 and 29 million barrels a month. These two months alone combine to produce lost entitlements obligations of over $1.1 *billion*. However, the total figures for the years 1979 and 1980 are simply staggering. For in these two years over 250.3 million barrels of crude oil disappeared from the entitlements program with a total entitlements value of $5.6 *billion*.

Plaintiff demonstrated in more specific terms, both independently and with the considerable aid of the DOE's own 1981 study of the problem, the likely methods by which price-controlled crude was made to disappear, and the exact ways in which the disappearance of price-controlled crude affected the entitlements program. Of all the possible reasons for the disappearance of price-controlled crude, the two most probable explanations for the disappearance phenomenon are miscertification and manipulative inventorying. Of the two, however, it would seem that the latter accounts for most of the price-controlled crude that has disappeared. This is primarily because manipulative inventorying is legal under the entitlements program regulations, and traditionally has been used by the industry for profit maximization since the inception of the program. Miscertification is not a legal act, and there would be little incentive to employ this method when the legal use of manipulative inventorying practices produces as "satisfactory" a result. Obviously,

profiteering under either of these methods is repugnant to the purposes of the entitlements program because it puts a disproportionate burden on those refiners that honestly shoulder their entitlements obligations, and places them at a competitive disadvantage.

Plaintiff also demonstrated in specific terms how this disappearance of price-controlled crude oil burdened the entitlements program refiners. The disappearance of price-controlled crude causes the DOSR to shrink, thereby causing less entitlements to be issued. The result to entitlements purchasers is that they are issued fewer entitlements overall, and must therefore make up for this decrease by purchasing additional amounts. In much the same manner, entitlements sellers are negatively affected by the disappearance because they are issued fewer entitlements as a result of the shrinking DOSR, and accordingly will have less entitlements to sell to make up for their comparatively limited access to price-controlled crude. Mobil's witness testified that, as a traditional entitlements purchaser, Mobil incurred additional entitlements burdens of $64 million in 1979, and $220 million of unnecessary entitlements obligations in 1980. Moreover, Mobil estimates that if the January 1981 entitlements notice is released in its contemplated form, Mobil will continue to incur unnecessary entitlements obligations of approximately $50 million. It should be remembered that every barrel of price-controlled crude that disappears and later reappears as higher priced uncontrolled crude, represents additional costs that may be passed on to the American public.

■ The DOE does not contest that refiners such as Mobil have been required to in effect suffer a multi-million dollar penalty as a result of the disappearance of price-controlled crude oil, and the DOE's continued practice of issuing entitlements notices that do not account for this missing crude. Neither can it be disputed by the DOE that it has known about the problem for at least four years. But it is equally apparent that the record is pathetically silent with regard to any efforts made by the DOE to correct the problem of disappearing price-controlled crude oil, or to ameliorate the harm this problem has caused and continues to cause entitlements program refiners. To the contrary, the DOE has insisted upon aggravating this problem, first, by ignoring it, and second, by the issue of post-decontrol entitlements notices that do not account for the price-controlled crude that has disappeared. In view of the fact that these notices are not reasonably accurate, and continue to burden entitlement program refiners substantially and unnecessarily by failing to "equitably distribute" the benefits of price-controlled crude, the DOE has illegally exceeded its statutory authority.

More specifically, the entitlements program as presently operated, intrinsically contradicts its stated purpose as expressed in the EPAA, and the legislative history of the program's regulations. The entitlements program survived previous challenges to its rationality and the authority of the FEA to enact the program, based on the "urgent need" to act in order to correct the supply and pricing inequities caused by the aftermath of the Arab embargo, and the "implementing agency's program for achieving the varied objectives of the [EPAA]." *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1402 (Em.App.1975); *Cities Service Co. v. FEA*, 529 F.2d 1016, 1022 (Em.App. 1975) (program serves objectives of the EPAA "to maximum extent practicable"). Today, the program does not face a crisis from without as much as one from within. The disappearance of price-controlled crude from the entitlements program undermines the "equitable distribution" of this crude oil, and fails to "assure that all segments of the petroleum industry will benefit equally from lower-priced domestic oil" to "the maximum extent practicable." Moreover, the disappearance of price-controlled crude ill serves the objective of "preserving an economically sound and competitive petroleum industry." And despite the DOE's contention, the entitlements program was intended to equitably distribute the benefits of price-controlled crude, not the burdens associated with its disappearance.

The Court also believes that the DOE has abused its discretion and acted in an arbitrary and capricious manner by the issuance of post-decontrol entitlements notices that fail to account for all of the price-controlled crude produced during the life of the entitlements program. Through its own investigations into the disappearance of price-controlled crude oil, the DOE has acquired reasonably sufficient knowledge of this problem, its causes, and the unnecessary and substantial burden that befalls entitlements program refiners as a result. In view of this knowledge, the reasonableness of the DOE's decision to issue post-decontrol entitlements notices without first addressing these concerns and taking corrective action must be seriously questioned. The DOE was clearly aware that these entitlements notices, as those that had been issued before, would not be reasonably accurate because of the large quantities of price-controlled crude oil that has disappeared, and that therefore could not be accounted for in the monthly entitlements allocations and notices. Similarly, the DOE's decision to issue these post-decontrol entitlements notices is equally irrational in view of the fact that the DOE has had four years since it learned of the problem of disappearing crude oil to take corrective measures.

Since 1977 when the DOE conducted its first study of the problem of disappearing price-controlled crude oil, it has been put on notice of the extent of this problem, its probable causes, and the implications they have had for the entitlements program. The DOE conducted or commissioned two other studies on the problem of disappearing price-controlled crude in 1978 and 1980–81. Each of these studies reported similar conclusions about the extent of the disappearance of price-controlled crude oil and the probable causes of this problem. As the Court's previous discussion of these studies indicate, see supra at pp. 437–438, the primary causes of the disappearance of price-controlled crude as identified in the 1977 and 1978 studies were attributable to reporting errors and regulatory loopholes. This list has been further narrowed by the most recent study of March 9, 1981, which points to the use of manipulative inventory practices as the primary cause of the disappearance of price-controlled crude.

The implications of this finding are especially significant in terms of the specific purposes of the entitlements program. The practice of manipulative inventorying is at direct cross-purposes with the entitlements program. While the entitlements program is intended to "equitably distribute" the benefits of price-controlled crude, the plain design of manipulative inventorying is to hoard stocks of price-controlled crude for self-gain. And although the entitlements program seeks to encourage "access" to price-controlled crude, manipulative inventory practices cause just the opposite effect. Furthermore, the entitlements program is designed "to provide all refiners with proportionate amounts of old oil, based on their relative refinery capacities." Manipulative inventorying, on the other hand, results in some refiners reaping a disproportionate benefit. Price-controlled crude oil that has disappeared, for example, by virtue of a "time exchange," will prevent the cost benefits associated with that crude from being "equitably distributed" to all refiners in the entitlements program. Finally, manipulative inventorying serves directly to promote "unnecessary interference with market mechanisms," and subverts the goals of "preserving an economically sound and competitive petroleum industry."

Although aware of this situation for the past four years, the DOE has done virtually nothing to prevent the use of manipulative inventorying, or to seek out those refiners who have sought to gain from such practices. Quite the contrary, by its stated intention to issue post-decontrol entitlements notices that do not fairly reflect all stocks of price-controlled crude oil produced and sold in the entitlements program, the DOE has clearly encouraged both the practice of manipulative inventorying and the disappearance of price-controlled crude, by providing refiners with the tacit assurance that they will not be sought out and be made to account for their actions. With the knowl-

edge that the purposes of the EPAA and the entitlements program were being subverted, the DOE had an affirmative obligation to stay the issuance of any entitlements notice until all of the price-controlled crude could be accounted for. The DOE's failure to do so amounts to a breach of its affirmative duty both under the EPAA to serve the objectives stated therein "to the maximum extent practicable," and under the specific purposes of the entitlements program.

A similar situation to that addressed by the Court today arose in *United Steelworkers of America v. Marshall*, 647 F.2d 1189 (D.C.Cir.1981), which involved a challenge to the validity of a standard under the Occupational Safety and Health Act. On the issue of whether the agency had an obligation to amend its standards in view of changed circumstances, the court held:

> where time does demonstrate the infeasibility of a standard once approved as feasible, so that the very predicate for the original rule and its statutory basis have disappeared, a court may well be able to deny the agency any discretion to refuse a new rulemaking.

At p. 1273.[28] This rule was also enunciated in *Geller v. FCC*, 610 F.2d 973 (D.C.Cir. 1979) (per curiam). There the court considered whether the FCC abused its authority in refusing to re-examine certain regulations that were adopted on the basis of a "consensus agreement," in light of recently passed copyright legislation, which affected the regulations in question. The Court found that the FCC erred in declining to institute a rulemaking:

> Undeniably, an agency normally possesses a generous measure of discretion respecting the launching of rulemaking proceedings. But though the discretion typically is broad, its exercise is reviewable if plainly misguided. Already this court has twice applied that principle to vacate agency orders rejecting requests for rule-

making on the mistaken ground that the agency lacked jurisdiction to promulgate the regulations proposed. And it goes without saying that the agency cannot sidestep a reexamination of particular regulations when abnormal circumstances make that course imperative. That, we think, was the situation here. While the procedural vehicle Geller utilized was a petition for rulemaking, the far more important fact was that its allegations served to alert the Commission to the possibility that the regulations imported from the consensus agreement lacked a nexus with the public interest once the sought-after revision of the copyright laws was accomplished.

*Id.* at 979 (footnotes omitted).[29]

In the instant case, the Court believes that the DOE has also "sidestepped" its administrative responsibilities by failing to reexamine the reasonableness of issuing post-decontrol entitlements notices, despite the mounting problem of disappearing price-controlled crude oil. The DOE has been amply informed about the extent of this problem, and having had four years to act upon it, is estopped to deny that it has had sufficient time within which to consider some form of corrective measure. In fact, it has gone to the other extreme by its continued intention to issue post-decontrol entitlements notices. The only effect of this course will be to exacerbate the problem of disappearing price-controlled crude, and the burden falling upon those refiners that do not use manipulative inventory practices to cheat or "game" the entitlements program. By so acting, the DOE has abused its discretion and has made a clear error in judgment.

This conclusion is particularly appropriate in view of the purposes of President Reagan's Executive Order No. 12287, which decontrolled the petroleum industry. Section 1 of the Executive Order rescinds all price and allocation controls. In addition, pursu-

---

**28.** While the DOE claims that it has not "refused" a rulemaking on the issues raised by plaintiff's complaint, the Court believes that in effect the DOE actions must be deemed a refusal.

**29.** Furthermore, the DOE is inaccurate when it states that the *Geller* court did not rule on the question of changed circumstances. *See* 610 F.2d at 978 n.39.

ant to Section 3 of the Executive Order, the Secretary of the DOE:

> *may* . . . adopt such regulations and take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order.

46 Fed.Reg. 9909 (January 30, 1981) (emphasis supplied). Also relevant to the instant discussion is Section 4 of the Executive Order, which states that the Secretary "is authorized to take such other actions as he deems necessary to ensure the purposes of this Order are effectuated." It is plain from even a cursory reading of these provisions that the DOE is not compelled, as it claims, to issue an entitlements notice that does not reasonably reflect production of price-controlled crude for that month. Moreover, contrary to the DOE's position, the Executive Order specifically refers to the issuance of entitlements notices that cover periods of time "prior to this Order." Thus, pursuant to the Executive Order, retroactive entitlements notices are to be employed to effectuate the purposes of the "orderly decontrol of crude oil and refined petroleum products." *See* Preamble of Executive Order No. 12287.

■■■ More specifically, it would seem that the Executive Order in fact places an affirmative duty on the part of the DOE to monitor the transition to decontrol and assure that it proceeds in an orderly fashion. The DOE's present course of action in issuing post-decontrol entitlements notices which it knows are not reasonably accurate, would contravene the principles set forth in the Executive Order. The issuance of these post-decontrol entitlements notices as presently contemplated will undermine the orderly processes of decontrol, by permitting some refiners to cheat and "game" the entitlements program at the expense of the other participating refiners, and the American public as well. In fact the vast majority of price-controlled crude that has disappeared has done so in the expectation of decontrol. The provisions of the Executive Order mandate a much different result.

In addition, the Executive Order, which envisions the gradual dismantling of the entitlements program, would further require the full accounting for all price-controlled crude produced and sold during the course of the program, before this dismantling had been completed. Consequently, the failure of the Secretary to exercise his discretion to stay the issuance of post-decontrol entitlements notices which do not reasonably reflect all price-controlled crude produced during the life of the entitlements program would violate the requirements of Executive Order No. 12287, and would be an abuse of discretion, and arbitrary and capricious. Furthermore, the failure of the Secretary to promulgate appropriate regulations that would account for the disappearance of price-controlled crude produced between November 1, 1974 and January 28, 1981, is also violative of the provisions of Executive Order No. 12287, and is an abuse of discretion and arbitrary and capricious. In sum, the Court believes that plaintiff has shown probable success on the merits. The next issue to be considered is whether plaintiff will suffer possible irreparable injury as a result of the DOE's actions.

## VI.

Plaintiff claims that it will suffer irreparable harm if the DOE is permitted to issue post-decontrol entitlements notices without first accounting for all of the price-controlled crude oil that has been produced and sold during the entitlements program. First, Mobil asserts that it will suffer irreparable monetary loss. According to Mobil, it will be unable to ever recover the millions of dollars it will be forced to spend for entitlements under an illegal entitlements notice. It says that refiners that have sold entitlements under the notice will have spent and relied upon the revenues received in such sales of entitlements by the time any corrective action is taken. In addition, Mobil alleges that many of these refiners have gone bankrupt and could not be forced to make restitution. As an example, Mobil

claims that for the month of February 1980, approximately 40% of the entitlements it purchased that month, or approximately $18 million, were paid to companies that have since filed for bankruptcy or gone bankrupt. *See* Affidavit of Roy K. Murdock, dated May 18, 1981. Furthermore, Mobil maintains that under similar circumstances in the past, the DOE has refused to make refiners pay back entitlements revenues that had been improperly received, or has stopped short of requiring the refiner to make full restitution. Thus, says Mobil, it is unlikely that it will be made whole should the Court subsequently determine that Mobile has been illegally required to comply with the post-decontrol entitlements notices.

Second, Mobil argues that if it were to attempt to avoid the irreparable injury caused by compliance with an entitlements notice, its only option would be to refuse to comply. However, Mobil states that this course of action would subject it to civil liability of $20,000 per day for each day of noncompliance, and criminal liability of imprisonment for one year and a fine of $40,-000 per day for each day of noncompliance. *See* EPAA § 5, 15 U.S.C. § 754; 10 C.F.R. §§ 205.203(a)(2), (b)(1)(A), (c)(1)(B). And finally, Mobil says that the issuance of a preliminary injunction would be in the public interest because it would serve to restore the fundamental purposes of the entitlements program through an accounting of all of the price-controlled crude oil that has disappeared from the program.

The DOE counters and argues that Mobil could not possibly suffer irreparable harm as a result of the issuance of any post-decontrol entitlements notice. First, the DOE asserts that threatened monetary loss could never amount to irreparable harm because Mobil would eventually be able to recover such losses at a later date. Moreover, the DOE contends that this Court could readily invoke its equity powers and fashion a remedy if for some reason Mobil could not recover its monetary losses directly from the refiners involved. In any event, says the DOE, it will eventually issue a "cleanup" entitlements notice that will account for any inequities suffered by participating refiners in the entitlements program before it is totally phased out. *See* 46 Fed.Reg. 15112 (March 3, 1981); 46 Fed.Reg. 23755 (April 28, 1981). The DOE also asserts that substantial harm will be caused to third parties if an injunction is issued. First, many refiners are heavily reliant on receipts of decontrolled crude, and would suffer if the January entitlements notice is enjoined from being issued. Also cited by the DOE is the administrative inconvenience that it would be caused if the post-decontrol entitlements notices were enjoined. If so encumbered, the DOE contends that it would be unable to fulfill its mandated responsibilities under Executive Order No. 12287.

The Court believes that plaintiff will suffer irreparable harm if the DOE issues its post-decontrol entitlements notices. Short of enjoining the DOE from issuing the pending January entitlements notice, it is virtually impossible, as a result of the unique provisions of the entitlements program, for plaintiff to be afforded any meaningful protection from the loss of approximately $50 million it would be illegally obligated for under the DOE's January notice. As previously described, entitlements obligations are not paid into the DOE, nor does it administer the actual transfer of funds under this program. Instead, the DOE simply imposes the entitlements obligations and under applicable regulations refiners are required to purchase or sell entitlements in accordance with the DOE's monthly notice. *See* 10 C.F.R. 211.67(b) (1980). In short, the DOE is severely hamstrung both legally and as a practical matter, in terms of the possible forms and extent of relief that it can order, to remedy a claim such as Mobil's. Possibly it is for this reason that the DOE has failed to make any specific suggestions with regard to what form of relief this Court could fashion to protect Mobil from irreparable harm. Neither could Mobil readily turn to a specific refiner and sue to recover illegally transferred entitlements obligations. As a primary matter, the Court knows of no case,

and the parties have cited none, which involved the factual situation before the Court today. The possible claims and counterclaims that could be made in such an action would seem more appropriately resolved in a law school classroom than in a court of law. Moreover, it genuinely appears that even if Mobil did pursue such an action they would be unable to recover a substantial portion of their illegally paid monies because of the financial health of many of their traditional entitlements trading partners. *See* Affidavit of Roy K. Murdock, dated May 18, 1981. This is not the speculative claim the DOE would have it be.

In addition, the proposed rulemaking which envisions the adoption of a final entitlements program adjustment mechanism would not go very far toward remedying plaintiff's impending monetary loss. *See* 46 Fed.Reg. 15112 (March 3, 1981). The proposed mechanism is designed to perform the very mechanical task of permitting adjustments and corrections to be made after the final entitlements notice which had been scheduled to be issued in March 1981, but which has been enjoined by various courts around the country from being released. This is the same type of function an entitlements notice had performed month after month, as discussed *supra* at p. 428, prior to decontrol. Because the entitlements notice mechanism was disbanded after the date of decontrol, the DOE decided that some mechanism was necessary to cover the adjustments and corrections for periods prior to January 28, 1981. Significantly, the proposed rulemaking makes no mention of the problem of the disappearance of price-controlled crude, and the necessity of adopting some form of final accounting in view of this problem. And it is clear from a review of the proposed rulemaking that it was never intended to remedy the burden imposed on entitlements program refiners as a result of the disappearance of price-controlled crude oil. As further evidence of this fact, according to the rulemaking, the post-decontrol adjustment mechanism would include a provision for an escrow account in the sum of $50 million to satisfy the various adjustments and corrections required. This escrow account is to be funded by monies paid in by all entitlements program refiners. Consequently, if Mobil ever attempted to recoup from the escrow account the $50 million it claims it lost due to the illegal use of manipulative inventory practices, the entire fund would have to be paid over to Mobil, part of which would have come out of Mobil's coffers to begin with.

By now it should become apparent, even to the DOE, that Mobil may rely on no other form of remedy except for injunctive relief. Moreover, the DOE misstates the law when it says that mere monetary damages would not entitle the plaintiff to injunctive relief. As a historical matter, a court's equity powers have always been properly invoked when no other form of remedy was available to the plaintiff, and as a consequence, immediate irreparable harm was threatened. *See* 7 Moore's *Federal Practice*, ¶ 65.18[3]. The Supreme Court defined the term "irreparable" as follows:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974) (emphasis in text) (footnote omitted) *citing Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958); *see also Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966) (plaintiff is not "required to show that otherwise rigor mortis will set in forthwith") (Friendly, J.). As the above discussion of plaintiff's available remedies indicates, no means of compensation would be available at a later date to remedy plaintiff's threatened harm. Thus, plaintiff is faced with the impossible choice of either refusing to comply with its entitlements obligations and face civil and criminal lia-

bility, or to comply and suffer the permanent loss of income and therefore irreparable injury.

A balancing of the various interests involved in this case also weighs in favor of granting plaintiff injunctive relief. Plaintiff's complaint alleges the scandalous mismanagement of a billion dollar government program with far reaching implications for both the petroleum industry and the American public as well. With the advent of decontrol, the DOE's mission is, for the most part, soon to end. The instant case represents one of the last opportunities to ensure that the DOE has lived up to its mandated obligations as required by the EPAA, the purpose of the entitlements program, and President Reagan's Executive Order No. 12287. The credible evidence produced before this Court would suggest that the DOE has not fulfilled those obligations. In view of this fact, injunctive relief would serve the public interest until such time as the DOE can be made to rectify its present course.

The only possible "harm" accruing to the DOE if an injunction is issued would be to require it to act in accordance with the original intention of the entitlements program and the EPAA. The Court appreciates that some third party entitlements sellers may be temporarily inconvenienced by the Court's action today, since an injunction against the January entitlements notice will hold up the transfer of entitlements that they have come to rely upon every month. Of course, any harm that they would suffer must be balanced against that of Mobil's, and of those refiners similarly situated to it, who have collectively expended billions of dollars of their own funds unnecessarily, and in disproportion to those refiners who have cheated and "gamed" the entitlements program for their own gain. But even if some third party refiners are temporarily inconvenienced, their purported right to continue to benefit from an apparently mismanaged government program must be junior to the right of those refiners such as Mobil, who also seek to claim the same benefit, by restoration of the program to its original intention.

Having determined that plaintiff has shown probable success on the merits and possible irreparable injury, the next question to be addressed by the Court is the scope of the preliminary injunction order. Plaintiff's underlying claim seeks a final accounting of all of the price-controlled crude oil that has been produced during the course of the entitlements program, as a remedy for the fact that millions of barrels of price-controlled crude have disappeared, and the added expense plaintiff has incurred as a result. It would appear that plaintiff's immediate intention in the instant motion was to preserve the status quo by moving to enjoin the January entitlements notice. This effort was made necessary due to the growing and persistent nature of the problem of disappearing price-controlled crude in the final months of the entitlements program. Specifically, by enjoining the issuance of the January entitlements notice, those refiners who were engaged in cheating or "gaming" the program would be prevented from succeeding in their plans, and plaintiff would be saved the added burden of complying with an entitlements notice that continued to reflect the disappearance of millions of barrels of price-controlled crude.

The DOE has raised the question of whether this Court has the power to enjoin the issuance of the January entitlements notice under the relevant provisions of Section 211 of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904, note, as incorporated by Section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1). In relevant part, Section 211(d)(2) of the ESA provides:

A district court of the United States or the Temporary Emergency Court of Appeals may enjoin temporarily or permanently the application of a particular regulation or order issued under this title to a person who is a party to litigation before it.

Section (e)(1) further provides:

Except as provided in subsection (d) of this section, no interlocutory or permanent injunction restraining the enforce-

ment operation or execution of this title, or any order or regulation issued thereunder, shall be granted by any district court of the United States or judge thereof. Thus, according to the DOE, while the Court may enjoin the issuance of the January entitlements notice in terms of its effect on plaintiff, the Court would be without jurisdiction to enjoin the notice and its effect on any third party. The Court disagrees.

The ESA as amended by 12 U.S.C. § 1904 note, was enacted for the purpose of stabilizing the inflationary spiral in the early 1970's, by placing price controls on wages, salaries, rents, and corporate dividends. *See* [1971] U.S.Code Cong. & Ad.News 2283. Under the ESA the President was given the authority to delegate the various responsibilities to enact such price controls to the interested agencies. While the agencies were provided with specific guidelines in enacting regulations under the ESA, a judicial review mechanism was also provided. The purpose of this measure was stated as follows:

> Any person suffering legal wrong because of any act or practice arising out of the operation of this Act or because of any regulation or order issued under the Act may bring an action in a Federal district court, without regard to the amount in controversy, and may seek all appropriate relief including a declaratory judgment, an injunction (except as limited by the provisions of section 211 of this Act), or damages.

*Id.* at p. 2291. Thus, for example, where a meat packers association objected to the manner in which a meat price ceiling regulation pertained to their particular operations, the relevant regulatory agency could be sued under Section 211. *See e. g. Western States Meat Packers Ass'n, Inc. v. Dunlop*, 482 F.2d 1401 (Em.App.1973). However, under the provisions of Section 211(d)(2), the disputed regulation could not be enjoined as against all persons subject to its provisions, but only to the plaintiff(s) before the court. It was thought that this method of judicial review would serve the "speed and consistency" of decisions arising under the ESA, would avoid any "breaks or stays in the operation of the program," and at the same time permit the aggrieved person to pursue judicial relief. [1971] U.S. Code Cong. & Ad.News 2292.

While on its face, Section 211(d)(2) would appear to limit the power of this Court to enjoin the entitlements program beyond that of its effect on the plaintiff in this action, the purpose of this provision demonstrates without doubt that it has absolutely no applicability to the instant proceeding. Plaintiff does not challenge the validity of the entitlements program as enacted under the ESA. Rather, plaintiff has brought suit charging the DOE with gross mismanagement of the program to the extent that the purposes of the program and the EPAA are being undermined. At issue is the fundamental ability of plaintiff to seek restitution for millions of dollars worth of obligations incurred under a government program, which has been supervised by an agency that has conceded such payments were unnecessary and unfair.

Curiously, that same agency would have the plaintiff be left with no meaningful remedy to recoup these losses. At present, the DOE does not know which refiners out of the three hundred that have participated in the entitlements program, were responsible for the millions of barrels of price-controlled crude that have disappeared from the entitlements program. Neither could the DOE claim that those same refiners, whoever they are, would not abscond with still more price-controlled crude with the issuance of the January entitlements notice, and thereby further injure plaintiff. Until such time as the DOE can reasonably resolve each of these questions, an injunction should properly issue to prevent the exacerbation of plaintiff's injury, and the dismantling of the entitlements program before all price-controlled crude oil produced during the course of the entitlements program is accounted for. Only in this manner will the purposes of the entitlements program, the objectives of the EPAA, and Executive Order No. 12287 be served. A ruling to the

contrary would only serve those who have thus far denigrated these principles with impunity.

Fortunately, basic principles of statutory construction would not compel this result or the Court to read Section 211 literally. As held by the Supreme Court in *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978):

> This Court, in interpreting the words of a statute, has "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute' . . . [b]ut it is otherwise 'where no such consequences would follow and where . . . it appears to be consonant with the purposes of the Act. . . .' " *Commissioner v. Brown*, 380 U.S. 563, 571 [85 S.Ct. 1162, 1166, 14 L.Ed.2d 75] (1965) (citations omitted).

These principles were addressed more recently in *In re Adamo*, 619 F.2d 216, 222 (2d Cir. 1980), where the Court stated as follows:

> It is a well established principle of statutory construction that a statute should not be applied strictly in accord with its literal meaning where to do so would pervert its manifest purpose. Nowhere has this principle been expressed more eloquently than by Judge Learned Hand in his concurring opinion in *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944), where he stated:
>
> > There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and although their words are by far the most decisive evidence of what they would have done, they are by no means final.

*See also Peter Pan Fabrics, Inc. v. Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960); *Federal Deposit Insurance Corp. v. Tremaine*, 133 F.2d 827, 830 (2d Cir. 1943).

In the instant case, this Court would be compelled to just such an absurd result if it were to hold that Section 211(d)(2) would preclude the grant of a preliminary injunction to prevent the DOE from issuing the January entitlements notice. The harm of which plaintiff complaints was clearly not anticipated by the framers of Section 211. But it is only reasonable to imagine that they would have desired the Court to issue an injunction where it would serve the purposes of the EPAA and the regulations promulgated thereunder, rather than deny such an injunction and give aid and comfort to those who would subvert its purposes. As an alternative holding, the Court believes that a preliminary injunction should rightfully issue under Executive Order No. 12287, and would enable the Court to enjoin the DOE from issuing the January entitlements notice as to *all* refiners.

## VII.

In conclusion plaintiff has demonstrated a likelihood of success on the merits and the possibility that it will suffer irreparable harm as a result of the DOE's issuance of the January entitlements notice. Therefore, the defendants are hereby enjoined from issuing any further entitlements notices and from requiring Mobil to comply with such notices. In addition, defendants' motion to dismiss plaintiff's complaint is denied.